JOHN DOE vs. RICHARD DOE.

Middlesex. December 4, 1978. — February 7, 1979.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, LIACOS, & ABRAMS, JJ.

*Practice, Civil,* Commitment of mentally ill person. *Mental Health.
Probate Court,* Incompetent person. *Guardian,* Mentally ill person.

Review of statutes governing commitment of the mentally ill. [275-
277]

Where the respondent in a petition brought under G. L. c. 201, § 6, was
neither suicidal nor homicidal as set forth in c. 123, § 1(1) and (2),
and where the respondent had expressed a comprehensible opinion
and strong feeling that he should not be committed, a showing of
"likelihood of serious harm," as defined in c. 123, § 1(3), was essen-
tial to a "best interests" finding under c. 201, § 6. [277-280]

Where a "best interests" finding under G. L. c. 201, § 6, rests on a
finding of "likelihood of serious harm," as defined in c. 123, § 1, the
latter finding must be supported by proof beyond a reasonable
doubt. [280-281]

General Laws c. 201, § 6, is not unconstitutionally vague, nor is the
"best interests" standard therein unconstitutional. [281]

PETITION filed in the Probate Court on January 18,
1978.

The case was heard by *Ginsburg, J.,* and questions of
law were reported by him to the Appeals Court. The Su-
preme Judicial Court granted a request for direct review.

*Paul K. Connolly, Jr.,* for the defendant.

*Stephen R. Katz* for the plaintiff.

BRAUCHER, J. We consider the effect of G. L. c. 201, § 6,
as amended through St. 1977, c. 567, § 1 (the statute),[1]

___

[1] In relevant part: "No guardian so appointed shall have the au-
thority to cause to admit or commit such person to a mental health
or retardation facility unless the court specifically finds the same to
be in the best interests of such person and specifically so authorizes
such admission or commitment by its order or decree. The court shall

denying to a guardian of a mentally ill person the au-
thority to commit the ward to a mental health facility
unless the court "specifically" finds commitment to be in
the "best interests" of the ward. We hold that in the
circumstances of the present case the statute requires a
finding, beyond a reasonable doubt, that failure to com-
mit would create a "likelihood of serious harm" as de-
fined in G. L. c. 123, § 1. So construed, the statute is not
unconstitutional. But since the required finding has not
been made, there must be further proceedings.

On January 18, 1978, after a hearing on the petition of
the ward's father, a judge of the Probate Court found that
the ward was a mentally ill person, incapable of taking
care of himself, that his welfare required the immediate
appointment of a temporary guardian, and that admis-
sion or commitment to a mental health facility was in his
best interest. The judge appointed the father "emergency
temporary guardian," with authority to authorize treat-
ment and to commit the ward to a mental health facility.
Subsequently counsel was appointed for the ward and the
matter was continued until March 24, 1978. The judge
then appointed the father guardian of the ward's person,
with authority to admit him to a mental health facility,
and reported four questions to the Appeals Court. We
granted the ward's application for direct appellate re-
view.

We summarize the facts agreed to by the parties. The
ward was born on October 30, 1960. He has a history of
depression, isolation and withdrawal, manifested by stay-
ing in his room and eating meals alone. He also has a

not authorize such admission or commitment except after a hearing
for the purposes of which counsel shall be provided for any indigent,
allegedly mentally ill person. The court shall require the attendance
of the allegedly mentally ill person at such hearing unless the court
finds that there exists extraordinary circumstances requiring his ab-
sence, in which event the attendance of his counsel shall suffice."
Similar provisions were added to G. L. c. 201, §§ 6A (mentally retarded
person) and 14 (temporary guardian). St. 1977, c. 567, §§ 2, 3.

history of epilepsy and asthma, requiring daily medication. On April 11, 1977, after an argument over the placement of the television set, he threatened to kill his father, took an overdose of his asthma medication, and later told his father he had tried to kill himself. He was taken to a hospital, had his stomach pumped, and remained in the hospital until he was admitted to McLean Hospital, a mental health facility, on April 27, 1977.

On admission he was characterized as a "great suicide risk" and diagnosed as having a schizoid character disorder and marked depression. He expressed suicidal thoughts at least through June, 1977, and continued to be depressed and isolated into 1978. He failed to understand his mental condition and his need for treatment, and denied both. In December, 1977, and in February, 1978, he left the McLean Hospital grounds without authority and without his medicine, and was returned by the police after a few hours. At the hearing on the appointment of a temporary guardian, a psychiatrist who had continually examined the ward since November, 1977, testified that he was mentally ill, suffering from chronic schizophrenia, undifferentiated type, that his condition had "improved somewhat," that he was not a suicide risk, but that there was a "significant possibility," if he were released and did not receive treatment, that his condition would regress to what it was prior to his admission. The psychiatrist further testified that the ward required inpatient treatment for six months to a year, that there was no viable alternative, that a halfway house would not be appropriate, and that if he returned home he would regress to his prior condition. The ward had stated that he did not want to stay at McLean Hospital, but would prefer to be with his father or with his grandmother or at a halfway house. The father is a suitable person to be the temporary guardian. It is not possible for the ward to live with his father or with his grandmother.

On the basis of the agreed facts and the testimony, the judge made findings "by a preponderance of the evi-

dence," including a finding that, for reasons stated, it was in the ward's "best interest" to remain at McLean Hospital. The judge did "not find beyond a reasonable doubt that" the ward was "dangerous to himself or to others."

The four questions reported by the judge are: (1) whether the statute is unconstitutionally vague, (2) whether the "best interests" standard violates the United States or Massachusetts Constitution, (3) whether the Probate Court may authorize commitment by a guardian under the statute only if the ward presents a "likelihood of serious harm" as defined in G. L. c. 123, § 1, and (4) whether the burden of proof required is a preponderance of the evidence or proof beyond a reasonable doubt. No objection is made to the form of the report, and we assume it was properly made under G. L. c. 215, § 13. See *O'Brien* v. *Dwight*, 363 Mass. 256, 274-275 (1973). We consider first the proper interpretation of the statute and the burden of proof imposed, and then the constitutional questions reported.

1. *The statutory background.* Modern revisions of our statutes governing commitment of the mentally ill show increased legislative concern with both substantive and procedural safeguards.

a. *Commitment by a guardian.* Statutory provision for the restraint and care of the mentally ill dates from the Seventeenth Century. In 1676, town selectmen were charged with the care of "distracted persons . . . that are vnruly, whereby not only the familjes wherein they are, but others, suffer much damage by them," so "that they doe not damnify others." 5 Records of the Governor and Company of the Massachusetts Bay in New England 1674-1686, 80 (1854). The responsibility of selectmen was expanded in 1694 to provide for the relief, support and safety of any person who is "naturally wanting of understanding, so as to be uncapable to provide for him- or herself," or who "shall fall into distraction and become *non compos mentis.*" Province Laws 1693-1694, c. 18, § 1. In 1726, the first statute authorizing appointment of pri-

vate guardians for "any ideot, *non compos,* lunatick or distracted person" also made provision for a judicial determination of incompetence. Province Laws 1726-1727, c. 12, § 1.

The statutory standard for appointment of a guardian, that a person be incapable of taking care of himself, first appeared in St. 1783, c. 38. It remained unchanged until St. 1956, c. 314, § 2, rephrased it to require that he be "incapable of taking care of himself by reason of mental illness." G. L. c. 201, § 6. Cf. G. L. c. 201, § 14 (temporary guardians, if the court finds that "the welfare of . . . a mentally ill . . . person . . . requires the immediate appointment"). Among the guardian's powers are the "care and custody of the person of his ward." G. L. c. 201, § 12, as amended through St. 1974, c. 845, § 6. Before 1977, care and custody of the person included the power to commit the ward to a mental health facility without prior court approval. See *Denny* v. *Tyler,* 3 Allen 225, 227 (1861); *Allis* v. *Morton,* 4 Gray 63 (1855). Cf. *Russell* v. *Russell,* 336 Mass. 762, 763 (1958) (appointment based on need for continued psychiatric treatment at hospital). Commitment by the guardian of a mentally ill person has been treated as "voluntary" admission. G. L. c. 123, § 10(*a*).

b. *Commitment by court order.* Our statutes on commitment by court order stem from St. 1797, c. 62, § 3, authorizing commitment to a hospital for the insane of any person who is "Lunatic & so furiously mad as to render it dangerous to the peace or the safety of the good people, for such lunatic person to go at large." Cf. St. 1836, c. 223, § 2, authorizing commitment of any person who is "an idiot or lunatic or insane, not being furiously mad." Until 1970, the judge was required to find merely that the person was "mentally ill" and a "proper subject for treatment in a hospital for the mentally ill." G. L. c. 123, § 51, as amended through St. 1959, c. 215, § 6.

In 1970, G. L. c. 123 was subjected to complete revision, motivated primarily by the view that the former law was "confusing, inconsistent and inadequate, and the civil

rights of the mentally ill not properly protected." Report of the Special Commission on Mental Health, 1967 Senate Doc. No. 1129, at 5. St. 1970, c. 888, § 4. See Developments in the Law—Civil Commitment of the Mentally Ill, 87 Harv. L. Rev. 1190, 1201-1207 (1974). As revised, c. 123, § 8 (*a*), authorizes a court order for commitment of a person only on findings that the person is mentally ill and that his discharge would create a "likelihood of serious harm." Cf. G. L. c. 123, § 12 (temporary commitment).

"Likelihood of serious harm" is defined in G. L. c. 123, § 1, as appearing in St. 1970, c. 888, § 4.[2] In *Superintendent of Worcester State Hosp.* v. *Hagberg*, 374 Mass. 271, 276-277 (1978), we held that the statutory "likelihood" must be proved beyond a reasonable doubt.

c. *The 1977 amendment.* The 1977 statute amending G. L. c. 201, §§ 6, 6A, and 14 (see note 1, *supra*), is entitled, "An Act further regulating the powers of guardians to admit or commit wards to mental health or retardation facilities without the consent of the wards." St. 1977, c. 567. Authority to admit or commit must rest on a "best interests" finding and must be specifically granted by the court. The ward must be present at the hearing, unless there are "extraordinary circumstances requiring his absence," and counsel must be provided if the ward is indigent.

2. *The "best interests" standard.* It seems clear that the requirement of a "best interests" finding was intended to limit the discretionary authority of the guardian to commit the ward to a mental health facility. The State has a

---

[2] "(1) a substantial risk of physical harm to the person himself as manifested by evidence of threats of, or attempts at, suicide or serious bodily harm; (2) a substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior or evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them; or (3) a very substantial risk of physical impairment or injury to the person himself as manifested by evidence that such person's judgment is so affected that he is unable to protect himself in the community and that reasonable provision for his protection is not available in the community."

traditional power and responsibility, under the doctrine of parens patriae, to care for and protect the "best interests" of the incompetent person, and in other contexts we have taken a flexible view of the concept of "best interests." *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728, 745 (1977) (medical treatment). *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 644 (1975) (consent to adoption). See Developments in the Law—Civil Commitment of the Mentally Ill, 87 Harv. L. Rev. 1190, 1220-1222 (1974).

The statute does not specify factors to be considered in the determination of "best interests," but the context helps, and there are traditional principles and policies to be observed. To appoint a guardian, the judge must find that the ward is "incapable of taking care of himself by reason of mental illness." G. L. c. 201, § 6. In *Fazio* v. *Fazio*, 375 Mass. 394, 399-400 (1978), we held insufficient a finding that the ward was in need of a guardian due to mental illness. In addition to evidence of mental illness, there must be evidence "of facts showing a proposed ward's inability to think or act for himself as to matters concerning his personal health, safety, and general welfare." *Id.* at 403. The requirement of an additional "best interests" finding suggests a legislative judgment that commitment may not be appropriate even though the ward is mentally ill and unable to care for himself.

What, if any, additional facts must be shown to warrant a "best interests" finding may of course vary with the circumstances. We are not here concerned with a ward who joins in an application for admission to a mental health facility. "A man may be insane so as to be a fit subject for guardianship, and yet have a sensible opinion and strong feeling upon the question who that guardian shall be. And that opinion and feeling it would be the duty as well as the pleasure of the court anxiously to consult, as the happiness of the ward and his restoration to health might depend upon it." *Allis* v. *Morton*, 4 Gray

63, 64 (1855). Similarly, the judge should consult the opinion and feeling of the ward as to admission to a mental health facility. "To protect the incompetent person within its power, the State must recognize the dignity and worth of such a person and afford to that person the same panoply of rights and choices it recognizes in competent persons." *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728, 746 (1977).

Nor is this a case of a ward incapable of formulating or expressing a preference. In such cases, we have applied a doctrine of substituted judgment. *Custody of a Minor,* 375 Mass. 733, 752-754 (1978) (two-year old child). *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728, 749-753 (1977) (profound mental retardation). Here the ward stated that he did not want to stay at McLean Hospital, but would prefer to be with his father or with his grandmother or at a halfway house. Although he failed to understand his mental condition and his need for treatment, we think his stated preference must be treated as a critical factor in the determination of his "best interests." Cf. *Baird* v. *Attorney Gen.,* 371 Mass. 741, 753-755 (1977) (preference of mature minor); *Smith* v. *Smith,* 361 Mass. 855 (1972) ("fears, hopes, desires and welfare" of children in custody dispute). The record does not show that the ward ever attended a hearing in court.

A showing of "likelihood of serious harm" would be sufficient to support commitment without the intervention of a guardian. In the circumstances of the present case, we have no doubt that such a showing would also warrant a finding that it is in the "best interests" of the ward to authorize commitment by the guardian. It is not suggested that the ward was either suicidal or homicidal at the time of the proceedings in the Probate Court. But the third type of "likelihood of serious harm" (see note 2, *supra*), "a very substantial risk of physical impairment or injury" to the ward, might rest on evidence (a) that his "judgment is so affected that he is unable to protect himself in the community" and (b) that "reasonable provision for his protection is not available in the community."

The question remains whether a showing of such "likelihood" is essential to a "best interests" finding under G. L. c. 201, § 6. In the circumstances of this case, we think it is. Those circumstances are that the case is not one in either the suicidal or the homicidal category of the statutory definition, and that the ward has and expresses a comprehensible opinion and strong feeling that he should not be committed. In these circumstances we think no less rigorous standard will give adequate recognition to the ward's dignity and worth.

The issue whether a finding of "likelihood of serious harm" would be warranted is not properly before us on the present record, and we express no opinion on that issue. It is not included in the question certified, and in large part the agreed facts and the judge's findings take the form of conclusions rather than supporting evidence. Moreover, the conclusions are not framed in the language of the statutory definition of "likelihood of serious harm."

We answer the judge's third reported question in the affirmative, but only with respect to the circumstances described above.

3. *Standard of proof.* In *Superintendent of Worcester State Hosp.* v. *Hagberg,* 374 Mass. 271, 276 (1978), we held that in cases of commitment for mental illness under G. L. c. 123, where defendants stood to lose their freedom and to be labeled as mentally ill, proof beyond a reasonable doubt was required. In *Fazio* v. *Fazio,* 375 Mass. 394, 400-402 (1978), we took note of that decision, but we left open the question of the standard of proof "in guardianship proceedings which do not necessarily or directly involve or result in a commitment." We held that the evidence in that case, whatever the standard of proof, did not warrant a finding under G. L. c. 201, § 6, that the ward was "incapable of taking care of himself by reason of mental illness." The question of the standard of proof applicable in making such a finding is not argued in the present case, and we again leave it open.

The "best interests" finding provided for in G. L. c. 201, § 6, we now hold, requires in the circumstances of the present case a showing of "likelihood of serious harm" as defined in G. L. c. 123, § 1. The purpose of that holding is to give the ward rights and choices similar to those he would have in proceedings under c. 123. Commitment pursuant to c. 201 produces the same loss of freedom and the same label of mental illness as commitment under c. 123. We therefore think it appropriate to apply the same standard of proof.

We answer the judge's fourth reported question in the affirmative to this extent: where a "best interests" finding under G. L. c. 201, § 6, rests on a finding of "likelihood of serious harm" the latter finding must be supported by proof beyond a reasonable doubt.

4. *Constitutionality.* It is not seriously argued that the statute, as we now construe it, is unconstitutionally vague, or that it violates due process or other provisions of the United States or Massachusetts Constitution. In other contexts we have upheld the application of a "best interests" standard. *Custody of a Minor,* 375 Mass. 733, 753 (1978) (medical treatment). *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption,* 367 Mass. 631, 646 (1975) (adoption). Cf. *Sylvander* v. *New England Home for Little Wanderers,* 444 F. Supp. 393 (D. Mass.), aff'd 584 F.2d 1103 (1st Cir. 1978).

We answer the judge's first two reported questions in the negative.

5. *Disposition.* The case remains in the Probate Court for further proceedings consistent with this opinion.

*So ordered.*