## GUARDIANSHIP OF JANE DOE.

Norfolk. September 5, 1991. - January 6, 1992.

Present: LIACOS. C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Medicine*, Withholding medical treatment. *Probate Court*, Withholding medical treatment, Incompetent person. *Incompetent Person*, Right to refuse medical treatment.

Discussion of the right of an individual to refuse or discontinue medical treatment, including the applicability of the substituted judgment doctrine to the case of an individual who has never been competent. [517-519] O'CONNOR, J., dissenting, with whom LYNCH, J., joined. NOLAN, J., dissenting.

In an action brought by the guardian of an incompetent person who exists in a persistent vegetative state, seeking authorization to remove the nasoduodenal tube through which the individual receives hydration and nutrition, the judge applied the correct standard of proof in making his determination with respect to the individual's substituted judgment. [523-525]

In an action brought by the guardian of an incompetent person who exists in a persistent vegetative state as a result of a progressive irreversible disease of the central nervous system, seeking authorization to remove the nasoduodenal tube through which the individual receives hydration and nutrition, the judge's findings with respect to the factors involved in applying the substituted judgment doctrine, including consideration of the Commonwealth's interests, supported the judge's conclusion that the individual would request withdrawal or withholding of treatment, including nasoduodenal feeding and hydration. [525] O'CONNOR, J., dissenting, with whom LYNCH, J., joined. NOLAN, J., disssenting.

PETITION filed in the Norfolk Division of the Probate and Family Court Department on May 23, 1990.

The case was heard by *Edward W. Farrell*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Jonathan Brant* for the ward.

*Allegra E. Munson (Kim E. Murdock,* Special Assistant Attorney General, with her) for Department of Mental Retardation.

*Frank Reardon (Mona Gross* with him) for the guardian.

ABRAMS, J. We are asked to decide whether a judge correctly determined that a profoundly retarded woman in a persistent vegetative state would choose, were she competent, to terminate her nasoduodenal feeding and hydration. After hearing, the judge made careful, detailed written findings and concluded that the woman, Jane Doe (a pseudonym), would choose to do so. Doe's parents agree with the judge's determination. Doe's permanent guardian (guardian), the guardian ad litem (GAL), and Doe's physicians agree with the judge's determination.[1] The Department of Mental Retardation (department), the agency responsible for Doe's care, also supports the judge's determination. Counsel for Doe, however, argues that we should vacate the judge's order because the judge applied an incorrect standard of proof.[2] We affirm the judgment.

I. *Prior proceedings.* In September, 1989, the department petitioned the Probate and Family Court Department to appoint a guardian to make medical decisions for Doe. Doe's parents declined to be appointed guardians, and opposed a proposal to replace her nasoduodenal feeding and hydration tube with a surgically-implanted percutaneous endoscopic gastrostomy (PEG) tube.[3] The judge appointed a GAL and

[1] The judge appointed three attorneys to look out for Doe's interests: a guardian ad litem, a permanent guardian, and counsel to represent her.

[2] Doe's counsel failed to raise this issue at trial and it is, therefore, not properly before us. See *M.H. Gordon & Sons, Inc.* v. *Alcoholic Beverages Control Comm'n,* 386 Mass. 64, 67 (1982), citing *Royal Indem. Co.* v. *Blakely,* 372 Mass. 86, 88 (1977); *Trustees of the Stigmatine Fathers, Inc.* v. *Secretary of Admin. & Fin.,* 369 Mass. 562, 565 (1976); and *Milton* v. *Civil Serv. Comm'n,* 365 Mass. 368, 379 (1974). Because of the seriousness of the substituted judgment decision, we comment on this issue. See *infra* at 523-525. See also *Albert* v. *Municipal Court of City of Boston,* 388 Mass. 491, 494 (1983).

[3] In her letter to the staff declining to be appointed, Doe's mother wrote that she "could foresee the day when [Doe's parents] would be confronted by [this] situation, [in which their] opposing viewpoints [from that of the

counsel for Doe. Thereafter, the judge appointed a temporary guardian, and later the temporary guardian became Doe's permanent guardian.

In May, 1990, Doe's guardian filed a petition requesting the judge to authorize the "withdrawal of the nasoduodenal tube through which [Doe] is presently receiving hydration and nutrition." On the same day, the GAL filed his third and final report with the court. In it, the GAL stated that "[t]here is no hope of either arresting or reversing [Doe's] degenerative neurological disease. If the ultimate question is to only prolong the dying process of a persistent vegetative patient with no hope of regaining cognitive functioning, then . . . [Doe] would consent to the withholding of treatment including nutrition and hydration."

The petition filed by Doe's guardian asked the judge "to determine whether [Doe] is capable of making informed decisions regarding the continuation of her medical treatment including, but not limited to, the provision of hydration and nutrition by nasoduodenal tube." The petition further requested the court, if it were to find that Doe was incompetent, to grant authority for "(1) [t]he withholding of invasive medical and surgical procedures; (2) [t]he withholding of life support medications and treatments, including, but not limited to, antibiotics; [and] (3) [t]he withdrawal of the nasoduodenal tube through which [Doe] is presently receiving hydration and nutrition."

The judge held a hearing on June 8, 1990, to consider the guardian's general petition. At the hearing, both the guardian and counsel for Doe agreed that Doe was incompetent, that she existed in a persistent vegetative state, and that there was no hope for improvement in her condition. The guardian also stated that Doe's parents supported the peti-

---

department's social workers] would lead to a long and painful court fight for which [they did not have] the emotional strength." The mother therefore declined to become Doe's guardian. In the letter, Doe's mother also objected to the PEG tube treatment. She added that she hoped that the Wrentham State School "would abide by [the parents'] wishes."

tion.[4] The judge allowed the petition and ordered termination of nasoduodenal feeding and hydration. Counsel for Doe appealed. We allowed his application for direct appellate review.

II. *The medical facts.* The medical facts are not in dispute and are as follows. Jane Doe is a thirty-three year old, profoundly retarded woman, who exists in a "persistent vegetative state."[5] Doe has been mentally retarded since infancy. Doe suffers from Canavan's disease,[6] which causes a progressive destruction of the central nervous system.[7] There is no possibility that her condition will improve. In 1988, Doe's doctors confirmed the diagnosis of Canavan's disease by a biochemical test first used in 1986. Verification of the diagnosis is significant in that it establishes that there is no hope for a reversal of Doe's condition.

Doe spent the first five years of her life at home with her parents and older brother. During the years Doe was at home, she was hospitalized repeatedly for a variety of ail-

---

[4] The judge found that the parents and the GAL, as well as the guardian and the Wrentham State School, supported the petition in good faith "and not for administrative convenience. . . . There [was] not the slightest doubt in the [c]ourt's mind in this regard. No such intimation has been advanced by [c]ounsel for [Doe] either."

[5] Doe "(a) shows no evidence of verbal or non-verbal communication; (b) demonstrates no purposeful movement or motor ability; (c) is unable to interact purposefully with stimulation provided by [her] environment; (d) is unable to provide for [her] own basic needs; [and] (e) [has] demonstrate[d] all of the above for longer than three months." *Brophy* v. *New England Sinai Hosp., Inc.*, 398 Mass. 417, 421 n.4 (1986). These facts are consistent with the definition of persistent vegetative state used by the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life-Sustaining Treatment 176-181 (1983).

[6] Canavan's disease is a genetic disorder. Its "salient clinical features are onset in early infancy, atonia of the neck muscles, hyperextension of the legs and flexion of [the] arms, blindness, severe mental defects and [megalocephaly]."

[7] In addition to Canavan's disease, Doe suffers from severe brain atrophy, cortical blindness, cortical deafness, flaccid quadriparesis with contracture of upper and lower extremities, seizure disorder, dysphagia with external feeding, permanent tracheostomy, chronic urinary tract infection, osteopenia, congenitally dislocated hips, and severe scoliosis.

ments. In 1963, when Doe's mother became pregnant with her third child,[8] Doe was admitted to the Wrentham State School (Wrentham).

In 1982, Doe had severe difficulty swallowing and repeatedly aspirated food fed to her by conventional means. Doe's physicians moved her to the Wrentham State School Medical Center (infirmary) and employed a nasoduodenal tube for feeding and hydration. Neither Doe nor her parents — nor, indeed, anyone — consented to the placement of the tube. Since 1982, Doe has received all her nutrition and hydration through the nasoduodenal tube.

Doe is dependent on the staff at Wrentham for all aspects of her care.[9] Doe's limbs are rigidly flexed, her joints contracted, her muscles atrophied and her bones extremely brittle. Doe breathes through a permanent tracheostomy necessitated by the tendency of her tongue to swell and block her airway. Doe is incontinent of both bladder and bowel and requires regular catheterizations and enemas.

Doe displays no awareness of herself or her surroundings. Doe "carries out no volitional activity, nor does she show any cognitive response to any type of sensory stimulus" — including stimuli calculated to cause intense pain in a conscious individual.[10] She exhibits no facial expressions and does not speak. She suffers from both cortical blindness and deafness, and she cannot feel or smell. Doe does not experience hunger or thirst; she is without emotion of any sort. Though her functioning brainstem allows Doe to breathe on

---

[8]The baby, a girl, also was retarded. In 1975, Doe's sister died of bacterial pneumonia associated with Canavan's disease.

[9]After, a personal visit to Doe, the judge found that the care Doe receives at Wrentham "is remarkable; it is obviously dedicated, loving, and caring."

[10]Although Doe responds to stimuli to her legs, the report of the examining neurologist states that in his opinion these responses are purely "reflexive in nature." Doe does not react at all to "noxious stimuli applied to her upper limbs." Finally, the report noted "a total lack of affective (emotional) change accompanying noxious stimuli applied to either the lower limbs or the upper limbs."

her own by means of a tracheostomy, she suffers from "a total loss of cerebral functioning."

III. *The right to refuse treatment.*[11] Competent individuals have the right to refuse medical treatment. *Norwood Hosp. v. Munoz*, 409 Mass. 116, 122 (1991). They have a concomitant right to discontinue medical treatment. *Brophy* v. *New England Sinai Hosp., Inc.*, 398 Mass. 417, 438 (1986).

The right to refuse treatment or to discontinue treatment is based on a person's strong interest in being free from nonconsensual invasions of the person's bodily integrity. See *Munoz, supra* at 122-123; *Brophy, supra* at 430; *Harnish* v. *Children's Hosp. Medical Center*, 387 Mass. 152, 154 (1982); *Matter of Spring*, 380 Mass. 629, 634 (1980); *Commissioner of Correction* v. *Myers*, 379 Mass. 255, 261 (1979); *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728, 738-739 (1977). See *Cruzan*, 110 S. Ct. 2841, 2846-2847 (1990). *In re Storar*, 52 N.Y.2d 363, 376-377, cert. denied, 454 U.S. 858 (1981); *In re Quinlan*, 70 N.J. 10, 38-42, cert. denied sub nom. *Garger* v. *New Jersey*, 429 U.S. 922 (1976). Because "the value of human dignity extends to both [competent and incompetent] individuals," *Saikewicz, supra* at 745, incompetent individuals have the same rights as competent individuals to refuse and termi-

---

[11]In this case no one contests that the nasoduodenal tube is medical treatment. Courts generally consider artificial hydration and nutrition, by nasoduodenal or gastrostomy tube, medical treatment. *Brophy, supra* at 437-438. See *Cruzan* v. *Director, Mo. Dep't of Health*, 110 S. Ct. 2841, 2852, 2856-2857 (O'Connor, J., concurring), 2866-2867 (Brennan, J., dissenting) (1990) (Although the Supreme Court Justices wrote a number of opinions, eight of nine Justices agree that withdrawal of feeding and hydration is medical treatment); *Gray by Gray* v. *Romeo*, 697 F. Supp. 580, 587 (D.R.I. 1988); *McConnell* v. *Beverly Enters. - Conn., Inc.*, 209 Conn. 692, 705 (1989); *Corbett* v. *D'Alessandro*, 487 So. 2d 368, 371 (Fla. App. 1986); *In re Estate of Longeway*, 133 Ill.2d 33, 42 (1989); *Matter of Sue Anne Lawrence*, Ind. Sup. Ct., No. 29S04-9106-CV-00460 (1991); *In re Gardner*, 534 A.2d 947, 954-955 (Me. 1987); *In re Conroy*, 98 N.J. 321, 372-373 (1985); *Delio* v. *Westchester County Medical Center*, 129 App. Div. 2d 1, 18-19 (N.Y. 1987); *In re Grant*, 109 Wash. 2d. 545, 559-562 (1987), corrected by 757 P.2d 534 (Wash. 1988). See generally American Medical Association, Council on Ethics and Judicial Affairs, Opinion 2.18 (1986).

nate medical treatment. *Custody of a Minor (No. 3)*, 378 Mass. 732, 745 (1979). *Saikewicz, supra* at 736. The fact that a person is incompetent should not result in the denial of that person's right to be free from nonconsensual invasions of bodily integrity. See *Matter of Moe*, 385 Mass. 555, 566 (1982).

The doctrine of substituted judgment is the means by which incompetents may exercise their right to refuse or terminate treatment. We have explained the doctrine in the following way. The judge, after hearing, must try to identify the choice "which would be made by the incompetent person, if that person were competent, taking into account the present and future incompetency of the individual as one of the factors which would necessarily enter into the decision-making process of the competent person." *Saikewicz, supra* at 752-753.

Lack of a prior expressed intention regarding medical treatment does not bar use of the doctrine of substituted judgment. See *Moe, supra* at 566; *Matter of Spring, supra* at 640. Accord *Foody* v. *Manchester Memorial Hosp.*, 40 Conn. Supp. 127 (1984); *Guardianship of Barry*, 445 So. 2d 365, 371 (Fla. App. 1984); *Estate of Longeway*, 133 Ill. 2d 33, 50 (1989). Cf. *Guardianship of Weedon*, 409 Mass. 196 (1991). We recognize that in situations in which there is an attempt to use substituted judgment for a never-competent person, it is a legal fiction. It is the legal mechanism by which society (at least in Massachusetts) attempts to vindicate liberty interests, albeit through a legal fiction. We are also aware that therefore "the substituted judgment [doctrine] is . . . difficult to apply." *Guardianship of Roe*, 383 Mass. 415, 444 n.16 (1981). That difficulty, however, "provides inadequate justification for denying its benefits. . . ." *Id.* "While it may . . . be necessary to rely to a greater degree on objective criteria [in the case of a never-competent person] . . . the effort to bring the substituted judgment into step with the values and desires of the affected individual must not, and need not, be abandoned." *Saike-*

*wicz, supra* at 751.[12]

IV. *Findings as to substituted judgment.* After a determination of incompetency has been made,[13] there are five factors that judges must consider in substituting their judgment for that of incompetent people. They are: the patient's expressed preferences; the patient's religious convictions and their relation to refusal of treatment; the impact on the patient's family; the probability of adverse side effects; and the prognosis with and without treatment. See *Brophy, supra* at 427; *Roe, supra* at 444.

a. *Patient's preferences.* In its effort to ascertain what Doe would choose for herself were she competent, the court below made a thorough inquiry into the nasoduodenal feeding and hydration treatment she receives. The judge found that a nasoduodenal tube is "intrusive" and that "[e]xtensive handling and manipulation of [Doe's] body are themselves pervasive bodily intrusions."

Because Doe "has never been in a position to make an informed decision for or against any kind of medical treatment," the judge determined that the views of Doe's parents were "the best mirror of [Doe's] wishes," had she ever been competent to form a preference.[14]

---

[12]Some of these objective criteria are the same as those considered in the "best interests of the ward" test. "[T]he best interests analysis, like that of the substituted judgment doctrine, requires a court to focus on the various factors unique to the situation of the individual for whom it must act." *Custody of a Minor*, 375 Mass. 733, 753 (1978). See *Custody of a Minor (No. 1)*, 385 Mass. 697, 710 n.10 (1982); *Custody of a Minor (No. 3), supra* at 745. See also *Guardianship of Linda*, 401 Mass. 783, 785 (1988) (noting that while ward's best interests are relevant to substituted judgment determination, "they are relevant only to the extent that the individual, if competent, would weigh them in deciding whether to accept treatment").

[13]The judge stated that "[i]t is beyond any question that [Doe] is incompetent to make an informed medical decision."

[14]The judge dismissed the argument of Doe's counsel that, by exceeding the normal life expectancy of a patient with Canavan's disease, Jane Doe demonstrates an unconscious will to live. Emphasizing the "lack of any evidence that [Doe] is able to comprehend or influence anything," the judge correctly rejected that argument as logically and legally incorrect. Doe's counsel misapprehends the doctrine of substituted judgment. Substi-

b. *Impact on family.* Doe's parents are completely in ac-
cord with the guardian's proposal to terminate treatment and
the judge's finding as to their daughter's substituted judg-
ment. The judge found that Doe's parents were acting in
"good faith" in asking for termination of medical treat-
ment.[15] See note 4, *supra.* The judge noted that Doe's
mother cared for her daily until the mother was beaten down
by exhaustion with the birth of her third, also retarded,
child. The judge noted that Doe's mother always acted with
"intelligence and compassion for her daughter."

c. *Religious beliefs.* The judge noted that Doe has "never
been in a position to acquire any religious beliefs" and,
therefore, that she holds "[no] religious beliefs . . . that
would" oppose the termination of nasoduodenal feeding and
hydration. The judge also remarked that no one — including
counsel for Doe — has identified any religious belief of either
Doe or her family that would compel the continuation of
tube feeding.

d. *Prognosis and side effects.* If her nasoduodenal tube is
not removed, the judge found, the prognosis is an indefinite
continuation of Doe's persistent vegetative state. "If the hy-
dration and nutrition treatment by tube is withdrawn," the
court explained, "then [Doe] would likely die of dehydration
in a matter of days." The medical evidence indicates that,
because of Doe's persistent vegetative state, she will not suf-
fer the effects of dehydration. For the same reason, side ef-

---

tuted judgment requires a judge to attempt to determine the decision
"which would be made by the incompetent person, if that person were
competent, but taking into account the present and future incompetency of
the individual as one of the factors which would necessarily enter into the
decision-making process of the competent person." *Saikewicz, supra* at
752-753. See *Munoz, supra* at 122 n.3; *Brophy, supra* at 433. Substituted
judgment is not based on subconscious nonvolitional actions.

[15]The judge quite properly did not consider whether Doe's continued
care would pose a burden of any kind on anyone. The cost of care in
human or financial terms is irrelevant to the substituted judgment analysis.
Mr. Justice Nolan's dissent, *post,* asserts that our opinion takes account of
the burden of Doe's continuing care. That assertion is incorrect.

fects of withdrawing treatment will cause Doe neither physical nor psychological discomfort.

V. *The Commonwealth's interests.* In granting the guardian's petition, the judge recognized that a ward's right to refuse treatment through the exercise of substituted judgment is not absolute. See *Munoz, supra* at 125; *Brophy, supra* at 432, citing, inter alia, *Myers, supra* at 261-262; *Saikewicz, supra* at 740-741. Rather, it may be constrained by at least four important State interests: (1) the preservation of life; (2) the protection of innocent third parties; (3) the prevention of suicide; and (4) the maintenance of the ethical integrity of the medical profession. See *Munoz, supra* at 125; *Brophy, supra* at 432; *Saikewicz, supra* at 741; *Matter of Spring, supra* at 641; *Matter of Hier*, 18 Mass. App. Ct. 200, 210 (1984).

a. *Preservation of life.* The judge emphasized that the Commonwealth's interest in preserving life is of vital importance. "The utmost caution," the judge admonished, "will be required to insure that overriding State interests are appropriately addressed." He nevertheless concluded that the Commonwealth's interest in preserving life was not sufficient in this case to override Doe's substituted judgment to refuse treatment.

The Commonwealth's interest in preserving life is strongest when it is attempting to protect its citizens from abuse or infringement of their rights. Where, however, as here, the appellees are striving to vindicate Doe's right to refuse invasive treatment, Doe's "right to self determination must prevail over the State's interest in preserving life for all." *Gray by Gray* v. *Romeo*, 697 F. Supp. 580, 589 (D.R.I. 1988), citing *Brophy, supra* at 438-439. *In re Gardner*, 534 A.2d 947, 955 (Me. 1987). Because the judge found that, were she competent, Doe would refuse nasoduodenal feeding, the maintenance of the tube against Doe's wishes "robs her of the right to determine her course of care." *Gray, supra* at 589.

The judge noted that had he been confronted with a petition to initiate nasoduodenal feeding and hydration, he would

have applied Doe's substituted judgment to refuse such treatment. The judge reflected that, if the Commonwealth's interest in preserving life could block removal of the tube in cases like this one, then physicians might refrain from using tubes initially in all but the clearest of cases. The judge concluded that this is a "medically undesirable" result. See *Brophy*, *supra* at 438, quoting *Matter of Conroy, supra* at 346-347 ("Such a rule could discourage families and doctors from even attempting certain types of care and could thereby force them into hasty and premature decisions to allow a patient to die"). See also 2 President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Making Health Care Decisions 75 (1982) ("An even more troubling wrong occurs when a treatment that might save or improve health is not started because the health care personnel are afraid that they will find it difficult to stop the treatment if, as is fairly likely, it proves to be of little benefit and greatly burdens the patient").[16]

b. *Prevention of suicide.* Because Doe will commit no act, the court found that the Commonwealth's interest in preventing suicide is not a consideration. It is well settled that withdrawing or refusing life-sustaining medical treatment is not equivalent to attempting suicide. See *Munoz, supra* at 125, citing *Saikewicz, supra* at 743 n.11; *Brophy, supra* at 439. Accord *Conroy, supra* at 350-351. Absent an intent to die, there can be no suicide. As we have previously held, a "death which occurs after the removal of life sustaining systems is from natural causes, neither set in motion nor intended by the patient." *Brophy, supra* at 439, citing *Rasmussen v. Fleming*, 154 Ariz. 200, 204 (1986), quoting *Welfare of Colyer*, 99 Wash. 2d 114, 123 (1983). As the judge noted, Doe has no ability to commit a volitional act.

The judge determined that Canavan's disease, not the removal of the feeding and hydration tube, would be the death

---

[16]The judge noted that the Commonwealth's interest in protecting third parties was not present in Doe's circumstances. See generally *Munoz, supra* at 129-130.

producing agent if the tube is removed. See *Brophy, supra* at 439. The judge in his findings stated that there is "[no] suggestion in any of the evidence that [Doe], her family, the Guardian, the [GAL] or staff at Wrentham would wish to commit or be involved in a suicide."

c. *Medical ethics.* Finally, the judge noted that "[t]here appears to be no disagreement that the proposed course of action by the guardian does not undermine the integrity of the medical profession."[17] Medical ethics do not require health care professionals to preserve life in every circumstance. See *Munoz, supra* at 127; *Brophy, supra* at 439-440; *Saikewicz, supra* at 743-44. In reaching his decision, the judge relied on two neurological consultations, three reports of the GAL, and a review of the case by a Wrentham ethics committee. None of these evaluations contests the recommendation that nasoduodenal feeding and hydration be discontinued. Medical ethics therefore are in no way compromised by termination of this treatment.

VI. *The judge's determination.* After carefully reviewing all the available evidence, and after visiting Doe personally, the judge determined that Doe's "subjective judgment would be to request withdrawal or withholding of treatment" including nasoduodenal feeding and hydration.[18]

In his analysis of the legal issues, the judge concluded that the legal standard to be used as a guide in making his decision was "a 'preponderance of the evidence' with an 'extra measure of evidentiary protection' [by reason of] specific findings of fact after a 'careful review of the evidence.' " Doe's counsel asserts that the judge erred in using this standard. We do not agree. We are firmly convinced that the seriousness of the decision will be more forcefully impressed on judges if they are required to set forth their findings in "me-

---

[17]Medical personnel or Wrentham staff members who disagree with the withdrawal of the nasoduodenal feeding and hydration tube will not be required to care for Doe.

[18]The order also placed on Doe's caregivers the duties to continue all other aspects of her daily care, as well as requiring them to prevent chapped lips, dry skin, and other possible side effects.

ticulous detail" than if they merely label their findings as meeting a particular standard. *Custody of a Minor (No. 3), supra* at 745. See *Matter of Moe, supra* at 572; *Custody of a Minor (No. 1)*, 385 Mass. at 713; *Roe, supra* at 425; *Custody of a Minor (No. 1)*, 377 Mass. 876, 886 (1979). "[A]s every judge knows, to set down in precise words the facts as he finds them is the best way to avoid carelessness in the discharge of [one's] duty: Often a strong impression that, on the basis of the evidence, the facts are thus-and-so gives way when it comes to expressing that impression on paper." *Custody of a Minor (No. 1)*, 377 Mass. at 886, quoting *United States v. Forness*, 125 F.2d 928, 942 (2d Cir.), cert. denied sub nom. *Salamanca v. United States*, 316 U.S. 694 (1942). See *Curtis v. Commissioner*, 623 F.2d 1047 (5th Cir. 1980).

In *Guardianship of Roe*, 383 Mass. 405, 425 (1981), we said that, in cases involving important personal rights, "we have refused to apply either the 'beyond a reasonable doubt' standard or the 'clear and convincing' standard." Rather, we have determined that "fact-finding is enhanced by requiring that it be done in writing and in meticulous detail." This rationale clearly applies to substituted judgment determinations. We are confident that judges, mindful of the serious consequences following entry of substituted judgment orders, will enter such orders only after carefully considering the evidence and entering specific findings on each factor and then balancing the various interests. *Id.* What we require is careful work and reflection on the part of the judge before entering a substituted judgment order.

On appeal, counsel for Doe relies on cases that he claims require that the standard be clear and convincing evidence: *Rogers v. Commissioner of the Dep't of Mental Health*, 390 Mass. 489 (1983) (administration of psychotropic medication to inpatient); *Roe, supra* (administration of antipsychotic medication to noninstitutionalized ward); *Doe v. Doe*, 377 Mass. 272 (1979) (civil commitment); *Superintendent of Worcester State Hosp. v. Hagberg*, 374 Mass. 271 (1978) (civil commitment); *Santosky v. Kramer*, 455 U.S. 745 (1982) (termination of parental rights); *Addington v. Texas*,

441 U.S. 418 (1979) (civil commitment); *Woodby* v. *INS*, 385 U.S. 276 (1966) (deportation).[19] In each of these cases, however, the government sought to infringe on a citizen's liberty interests. Here, by contrast, Doe's guardian (as well as her parents) is attempting to determine Doe's preference in order to vindicate Doe's rights to bodily integrity and privacy. See *Moe*, *supra* at 572. We therefore conclude that the judge was correct in his ruling on the appropriate standard of proof.

In this case, the judge's findings "make it manifest that the utmost care was devoted to the determination of [substituted judgment]." *Custody of a Minor (No. 1)*, 377 Mass. at 886. After finding the facts and analyzing all the factors, the judge concluded that Doe's "subjective judgment would be to request withdrawal or withholding of treatment." The judge determined that, were Doe competent, she would wish to "go in peace."

The judge's decision and order are affirmed.

*So ordered.*

NOLAN, J., (dissenting). The court again decides to play God. Death by starvation and dehydration will not assist Jane Doe in her unquestionable desire to "go in peace." See *Brophy* v. *New England Sinai Hosp., Inc.*, 398 Mass. 417, 444 n.2 (1986) (Lynch, J., dissenting) (detailing physical

---

[19]In his brief, counsel for Doe also mischaracterizes the *Cruzan* case. The "precise" question before the Supreme Court was not "[t]he issue of standard of proof." The *precise* question regarding standards of proof was "whether the United States Constitution *forbids* the establishment of the [clear and convincing evidence] requirement by the State" (emphasis added). *Cruzan*, *supra* at 2852. The Supreme Court held that it did not.

Doe's counsel also cites termination-of-treatment cases decided by other courts. To the extent that those States limit their inquiry to express statements of preference, *Matter of Westchester Medical Center on Behalf of Mary O'Connor*, 72 N.Y.2d 517 (1988); *McConnell* v. *Beverly Enters. - Conn., Inc.*, 209 Conn. 692 (1989), or do not use substituted judgment analysis, *In re Swan*, 569 A.2d 1202 (Me. 1990); *Couture* v. *Couture*, 48 Ohio App. 3rd 208 (1989); *Gardner*, *supra*, they are inapplicable.

traumas resulting from withdrawal of hydration and nutri-
tion). The majority's insinuation that the decision to termi-
nate her food and water will give effect to her wish is both
morally offensive and intellectually curious, to say the least.

There is absolutely no basis on which to conclude that Doe
would choose to die by starvation and dehydration if she
were competent. The possibility that she wishes to terminate
the provision of food and water is no more likely than the
possibility that she fears this action and hopes, in her help-
less state, that society will continue to meet her basic needs.[1]
Given this reality, where lies the logical, moral, and ethical
justification for depriving her of food and water? Without
addressing this threshold dilemma, the majority determines
that Ms. Doe would prefer death over life and concludes that
we should assist her in meeting that end, under the guise of a
heroic vindication of her liberty interests. There is no glory in
this last hurrah.

As an initial matter, the substituted judgment doctrine,
which even the majority opinion recognizes as a "legal fic-
tion," is a completely inappropriate device in cases involving
the medical treatment of incompetents.[2] Even if the substi-

---

[1] It would seem that a person who never has been physically or mentally
competent, one who never has known or enjoyed the full panoply of life's
offerings, would be less expecting in terms of the quality of his or her life.
The person may find whatever satisfaction he or she derives from his or
her existence to be valuable and sacred. It is wrong, therefore, to discuss
this matter in terms of what Ms. Doe would decide if she were competent,
since that standard attributes knowledge of the loss of quality of life to the
incompetent and presumes that the person's decision would involve a com-
parison of his or her objectively poor situation in relation to healthy, com-
petent persons.

[2] An ever-increasing number of commentators is reaching the same con-
clusion. See, e.g., Buchanan, The Limits of Proxy Decisionmaking for In-
competents, 29 UCLA L. Rev. 386, 393-397 (1981); Weber, Substituted
Judgment Doctrine: A Critical Analysis, 1 Issues in Law and Med., 131,
131-159 (1985); Note, "Someone Make Up My Mind": The Troubling
Right to Die Issues Presented by Incompetent Patients with No Prior Ex-
pression of a Treatment Preference, 64 Notre Dame L. Rev. 394, 403-407
(1989). Two authors, in considering the substituted judgment doctrine,
have referred to the doctrine by a more appropriate appellation, the "in-
vented consent" doctrine. Bopp & Avila, The Sirens' Lure of Invented

tuted judgment doctrine were a proper approach for cases involving the medical treatment of incompetents, the majority opinion completely ignores the evidentiary constraints that are part and parcel of the doctrine. When this court initially adopted the substituted judgment doctrine, it relied upon an early Nineteenth Century British case, *Ex parte Whitbread in re Hinde, a Lunatic*, 35 Eng. Rep. 878 (1816), which involved the administration of the estate of an incompetent person. *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728, 751 (1977). As the *Saikewicz* court recognized, the substituted judgment doctrine was used in *Whitbread* to authorize a gift from the estate of an incompetent to a person to whom the incompetent owed no duty of support. *Id.* at 751-752. As Professor Louise Harmon pointed out in her critique of the substituted judgment doctrine, Harmon, Falling Off the Vine: Legal Fictions and the Doctrine of Substituted Judgment, 100 Yale L.J. 1 (1990), there are serious ramifications that result from applying what is, in essence, property law to determine the rights of incompetent patients to medical treatment. See *id.* at 65-67 (discussing irresponsibility of applying property law to rights of incompetent patients).

Even if one were to overlook the basic inappropriateness of using a property law concept in this situation, the substituted judgment doctrine itself, as it developed in property law, bears little resemblance to its use in the area of medical treatment for incompetents. In the first place, the English common law differentiated two types of incompetents: the lunatic, who once possessed a sound mind and was expected to recover, and the idiot, who never possessed a sound mind. *Id.* at 16. The substituted judgment doctrine in property law applied only to lunatics, for whom there was evidence of their former intentional states, and it was not applied to an incompetent such as the patient in this case for whom there was no evidence of her former intentional state. See *id.* at 63-64

Consent: A Critique of Autonomy-Based Surrogate Decisionmaking for Legally-Incapacitated Older Persons, 42 Hastings L.J. 779, 780 (1991).

(substituted judgment doctrine appropriate only for lunatics, not idiots).

Even the *Whitbread* decision, which only concerned a lunatic, generated judicial distrust, and later decisions imposed strict evidentiary constraints upon its use. *Id.* at 24-25. Chief among these constraints was evidence of the lunatic's former intentional state. *Id.* at 25. "Subsequent Chancellors looked for a degree of consanguinity, a history of prior warmth and affection, perhaps statements made by the lunatic of his intent to make gifts to the petitioner, or even evidence of past gift-giving on which to hang a moral obligation. He was no longer a generic, reasonable lunatic prone to giving his money away.[3] Instead, he was a specific individual with a past that had to be consulted." (Footnote omitted.) *Id.* at 26.

When the substituted judgment doctrine in property law was transported to America, the evidentiary constraints were even stricter than those in England. Harmon, *supra* at 27. Indeed, a presidential commission stated: "The substituted judgment standard can be used only if a patient was once capable of developing views relevant to the matter at hand; further, there must be reliable evidence of these views." President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life Sustaining Treatment at 133 (1983). How ironic that a property law concept not only has been transformed to our jurisprudence on the rights of incompetents to medical treatment but also has been applied more liberally in this area.

The majority opinion observes, *ante* at 521, that "[t]he Commonwealth's interest in preserving life is strongest when

---

[3]Compare the language used in *Doe, ante* at 518, quoting *Saikewicz, supra* at 752-753 (the choice is to be made "by the incompetent person, if that person were competent, but taking into account the present and future incompetency of the individual as one of the factors which would necessarily enter into the decision-making process of the competent person"). Thus, while we have done away with the "generic, reasonable lunatic" in property law, we have created the generic reasonably competent incompetent in cases of medical treatment of incompetents.

it is attempting to protect its citizens from abuse or infringe-
ment of their rights," but then dismisses this potentially
overriding interest by refocusing the issue in this case as the
championing of Ms. Doe's fundamental rights to bodily in-
tegrity. This clever approach omits to explain why the State's
strong interest in protecting its citizen's right to receive nu-
trition from being abused or infringed upon is not so worthy
of defense as the citizen's right to self-determination, espe-
cially where there is no genuine expression of the citizen's
preference. Moreover, there is no recognition of the State's
duty to provide adequate food and medical care to its citizen,
who has a protected liberty interest in the same. *Youngberg
v. Romeo*, 457 U.S. 307, 324 (1982).

The court ostensibly involves itself in this matter to protect
the interests of the vulnerable and then takes advantage of
Ms. Doe's vulnerability to fashion an argument that she is a
social, medical and familial burden and that her simple, fun-
damental needs should no longer be met. Ms. Doe cannot
speak, so the court utters fatal words on her behalf. The
court should not guess as to what she would say, if she had
the ability to do so. On balance, the only choice which truly
respects the value of Ms. Doe's life — indeed, human life —
is the recognition and acceptance of our duty to feed and
hydrate this dependent member of our society, until her inev-
itable demise.

"The feeding of the hungry, whether because they are poor
or because they are physically unable to feed themselves, is
the most fundamental of all human relationships. . . . It is a
most dangerous business to tamper with, or adulterate, so en-
during and central a moral emotion." Callahan, On Feeding
the Dying, 13 Hastings Center Rep. at 22 (Oct. 1983).
Widespread acceptance of this social sentiment is reflected in
the fact that, out of thirty-nine living will statutes, twenty
explicitly provide that "medically administered nutrition and
hydration are not life-sustaining treatments which can be
withdrawn pursuant to a directive." Zinberg, Decisions For
The Dying: An Empirical Study of Physicians' Responses To

Advance Directives, 13 Vt. L. Rev. 400, 458-459 & n.45 (1989).

The characterization of the provision of food and water as a medical treatment or a basic entitlement requires a determination of what life means — a task of no small magnitude. Yet, the conclusion easily reached today regrettably answers that profound question, stating, in effect, that those persons who depend on the care of others and technological advances for their comfort and survival do not have "life," or at least do not have a protected interest in it.

Therefore, I dissent.


O'CONNOR, J. (dissenting, with whom Lynch, J., joins). The judge determined, and the court affirms, that, "were Doe competent, she would wish to 'go in peace.' " *Ante* at 525. As I did in *Brophy* v. *New England Sinai Hosp., Inc.,* 398 Mass. 417, 448-453 (1986), and *Norwood Hosp.* v. *Munoz,* 409 Mass. 116, 131-133 (1991), I protest the court's legal embrace of suicide — and beyond. As recently as 1980, the court stated that, "a competent person has a general right to refuse medical treatment *in appropriate circumstances,* to be determined by balancing the individual interest against countervailing State interests, particularly the State interest in the preservation of life" (emphasis added). *Matter of Spring,* 380 Mass. 629, 634 (1980). See also *Superintendent of Belchertown State Sch.* v. *Saikewicz,* 373 Mass. 728, 745 (1977). More recently, however, and ominously, the limiting references to appropriate circumstances and State interests have disappeared from the court's definition of the right to refuse life-sustaining treatment. In the present case, the court describes the right this way: "Competent individuals have the right to refuse medical treatment. *Norwood Hosp.* v. *Munoz,* 409 Mass. 116, 122 (1991). They have a concomitant right to discontinue medical treatment. *Brophy*[, *supra* at] 438." *Ante* at 517. Then, in order to make clear that the new formulation of the rule is indeed designed to grant competent individuals an unqualified and absolute right of self

determination, the court states in a conclusory fashion: "The Commonwealth's interest in preserving life is strongest when it is attempting to protect its citizens from abuse or infringement of their rights. Where, however, as here, the appellees are striving to vindicate Doe's right to refuse invasive treatment, Doe's 'right to self determination must prevail over the State's interest in preserving life for all.' " *Ante* at 521. The court's position is clear: Although the State may have a legitimate interest in supporting a competent individual's election to live, it has no legitimate interest in opposing or frustrating anyone's choice to die. The court reaffirms what it declared in *Brophy, supra,* and *Munoz, supra,* despite its disclaimer in those cases, that a competent individual has a legal right in this Commonwealth to commit suicide, and that others have a right to assist him or her in that effort.

Suicide, the purposeful termination of one's own life, is no less suicide when death is accomplished by inaction than when an affirmative act is employed as the agent of death. As Justice Scalia wrote in *Cruzan* v. *Director, Mo. Dep't of Health,* 110 S. Ct. 2841, 2861 (1990) (Scalia, J., concurring), "[i]t would not make much sense to say that one may not kill oneself by walking into the sea, but may sit on the beach until submerged by the incoming tide. . . . Starving oneself to death is no different from putting a gun to one's temple as far as the common-law definition of suicide is concerned; the cause of death in both cases is the suicide's conscious decision to 'put an end to his own existence.' 4 Blackstone, [Commentaries] at *189." Similarly, there is no valid moral or legal distinction between active and passive euthanasia.

I would agree that the law should recognize a competent person's right to refuse or withdraw medical treatment when that choice is not motivated by a desire to die but, instead, is reasonably motivated by a desire to avoid procedures that are in themselves, and not simply because they prolong life, physically or emotionally painful. Suicide, however, is a different matter. Society's respect for the value of every human life without reference to its condition, the cornerstone of

American law, is inconsistent with a State's recognition of a legal right to commit suicide, assist suicide, or engage in voluntary euthanasia (mercy killing in accordance with the wishes of the suffering person). "The life of those to whom life has become a burden — of those who are hopelessly diseased or fatally wounded — nay, even the lives of criminals condemned to death, are under the protection of the law, equally as the lives of those who are in the full tide of life's enjoyment, and anxious to continue to live." *Cruzan, supra* at 2860 (Scalia, J., concurring), quoting *Blackburn* v. *State*, 23 Ohio St. 146, 163 (1873). Recognition of the dignity of human life demands resistance, rather than concession, to the real or imaginary death wishes of those who are afflicted with pain, depression, a sense of personal worthlessness, or a sense of burdensomeness to others A humane society provides support of every kind, including moral support, to those who are burdened in order that they may *live*, not "go," as the Probate Court judge, with this court's approval, would have it, *ante* at 525, in "peace." No "legal system" is worthy of that appellation unless its primary function is to protect the most vulnerable members of society. It follows that, in the absence of otherwise compelling legislation, no court should recognize a legal right to commit suicide, whether by action (e.g., lethal injection) or by inaction (e.g., withdrawal of nutrition and hydration, or withdrawal of antibiotic medication to treat pneumonia). Nor should any court recognize a corresponding right to assist in suicide or to engage in the closely related practice of voluntary euthanasia.

Can it reasonably be doubted that legal acceptance of suicide, assisted suicide, and voluntary euthanasia presents a serious risk that acceptance of involuntary euthanasia (mercy killing not chosen by the affected individual) is soon to follow? Today's decision is most instructive. Indeed, it is a case in point. By a process of substituted judgment, a Probate and Family Court judge, affirmed by this court, attributed to Jane Doe, a woman who has been profoundly retarded since infancy and exists in a persistent vegetative state, a choice to discontinue the tube-feeding and hydration necessary to her

survival. This attribution of choice was made and affirmed although Doe, never having had an ability to commit volitional acts, and showing no response to stimuli calculated to cause pain in a conscious individual, could not possibly have sought to be free from physically or emotionally painful treatment. Nevertheless, the choice made for, and attributed to, Doe is said to have been predicated on the judge's decision, based on the preponderance of the evidence, that Jane Doe, were she competent, would have preferred death over life as she was living it, and would have requested that her choice to end her life be honored. On the basis of an assessment of the quality of life accessible to Doe, the judge authorized the withholding of food and water in order that Doe, who actually had no say in the matter, might "go in peace." If this is not involuntary euthanasia, or worse, it is hard to know what is.

The court states: "We recognize that in situations in which there is an attempt to use substituted judgment for a never-competent person, it is a legal fiction." *Ante* at 518. Black's Law Dictionary 894 (6th ed. 1990), defines "legal fiction" this way: "Assumption of fact made by court as basis for deciding a legal question. A situation contrived by the law to permit a court to dispose of a matter, though it need not be created improperly; e.g. fiction of lost grant as basis for title by adverse possession." Doe's choice to discontinue nourishment and hydration is indeed a contrivance. By the nature of her illness, she is without pain; "she is without emotion of any sort." *Ante* at 516. Therefore, nothing related to her own best interests would suggest to her, were she competent, that it is time for her to go in peace. And even if she were hurting, how can anyone say, applying even the minimal preponderance of the evidence standard of proof, that it has been established that Doe, if she were competent, would choose death over life? Almost everyone has known someone who has tenaciously clung to life against all odds despite immense anguish and pain. There are many possible explanations for that in addition to mankind's innate instinct to survive. For example, were she competent, Jane Doe might consider her

life a precious gift from God to be nourished, not rejected. If, indeed, the court's goal is to protect Jane Doe's liberty interest in individual choice, the court should recognize that "[i]ndividual choice is determined not by the vote of the majority but by the complexities of the singular situation viewed from the unique perspective of the person called on to make the decision." *Saikewicz, supra* at 747. It obviously is impossible to know what never-competent Jane Doe's unique perspective would have been or what life and death choice she would have made had she been competent. Perhaps she would have exercised the most fundamental right anyone has — the foremost right protected by the Federal and State Constitutions — the right to life. By imposing a death, rather than life, choice on Jane Doe, it is arguable that the court violates that right. Surely, by imposing a judicial choice, the court violates the very value it professes to espouse: the dignity of incompetent persons and their concomitant right to self determination.

The court's attempt to use substituted judgment for a never-competent person is not the only fiction to be found in its opinion. There are several others, but I shall focus on only three. The first of these is that the court's approval of the withdrawal of Jane Doe's nutrition and hydration is given for Jane Doe's benefit. That leads me to ask how she benefits from an early death. She is not burdened by life. She need not "go" to be in peace. For all that appears, with food and drink and care she can "stay" in peace. Any benefit derived from terminating Jane Doe's life is derived by someone else.

The second fiction I wish to address concerns causation. Quoting *Brophy, supra* at 439, the court claims that "death which occurs after the removal of life sustaining systems is from natural causes, neither set in motion nor intended by the patient." *Ante* at 522. The court states, with obvious approval, that "[t]he judge determined that Canavan's disease, not the removal of the feeding and hydration tube, would be the death producing agent if the tube is removed." *Ante* at 522-523. That surely is "[a] situation contrived by the law to permit a court to dispose of a matter." The court employs a

device, a pretense, contrived for the purpose of authorizing the termination of Jane Doe's life. It is clear that, but for removal or non-use of the nasoduodenal tube, Jane Doe will live for the indefinite, perhaps considerable, future. Without it she will promptly die. That is proximate causation according to any recognized definition of that term.

The fiction as to causation is especially disturbing because its apparent purpose is to give support to the further fiction, expressed elsewhere in the court's opinion, that the feeding and hydration of Jane Doe may be discontinued without anyone being responsible for her death. Doe will not be responsible, says the court, because she is incapable of choice ("Doe has no ability to commit a volitional act." *Ante* at 522). Others will not be responsible because they are only vindicating Jane Doe's choice, not exercising their own. *Ante* at 522. In any event, the court says, Doe's death will result only from natural causes and not from starvation due to withdrawal of the nasoduodenal tube.

I am not insensitive to the immense burden carried by Jane Doe's family for a long time. Furthermore, I do not underestimate either the complexity of questions that may arise as a result of scientific advancements enabling the prolongation of life, nor am I unaware of associated anguish and stress. Lastly, I do not intend by the expression of my views in this opinion to demonstrate disrespect for those with whom I disagree. However, I must make very clear that I view the court's decision and its reasoning today as seriously wrong. The implications of this decision are frightening, not only for Jane Doe but for others similarly situated, such as the institutionalized, the elderly, and children with "defects" who are too young to make decisions for themselves. I would reverse the judge's order.