## CARE AND PROTECTION OF BETH.

Hampden. November 7, 1991. - March 11, 1992.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Medicine*, Withholding medical treatment. *Probate Court*, Incompetent
   person, Withholding medical treatment. *Supreme Judicial Court*, Su-
   perintendence of inferior courts. *Incompetent Person*, Consent to medi-
   cal treatment, Right to refuse medical treatment.

The circumstances of an incompetent minor, including her age and exis-
   tence in a persistent vegetative coma, made appropriate a judicial de-
   termination whether to enter a "no code" (do-not-resuscitate) order on
   the minor's medical charts, through the doctrine of substituted judg-
   ment. [192-195] NOLAN, J., dissenting.
The findings of a judge, in applying the doctrine of substituted judgment
   to make a determination that a "no code" order be entered on an in-
   competent minor's medical charts, supported his conclusion that the
   child would refuse resuscitative measures in the event of cardiac or re-
   spiratory arrest [195-198], and that the State's interest did not out-
   weigh the child's wishes [198]. NOLAN, J., dissenting.

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on April 26, 1989.

The case was reported by *Wilkins*, J., on a statement of
agreed facts.

*John F. Moriarty, Jr.*, guardian ad litem.

*Jon Laramore*, Assistant Attorney General, for Depart-
ment of Social Services.

ABRAMS, J. A single justice has reserved and reported the
correctness of a substituted judgment determination calling
for a "no code"[1] order to be entered on the medical charts of

---

[1] A "no code" order, also referred to as a "DNR" or do-not-resuscitate
order, directs a hospital and staff not to employ extraordinary resuscitative
measures in the event of cardiac or respiratory failure. "The terminology
derives from the development in recent years, in acute care hospitals, of

an incompetent minor ward. A judge of the Holyoke Division of the District Court determined that an infant in a persistent vegetative coma would choose, were she competent, to have the "no code" order entered on her medical charts. For the reasons stated we affirm.

*Facts.* The child whose treatment is at issue was born on September 30, 1986. Her mother and putative father were both minors at the time. Less than one month after her birth, in response to a petition filed by the Department of Social Services (DSS), a District Court judge found the child to be in need of care and protection. By order of the District Court, DSS gained legal and physical custody of the child. On October 30, 1986, the child's mother was also found in need of care and protection and placed in DSS custody. In December of the same year, DSS returned physical custody of the child to her mother, while retaining legal custody.

Shortly thereafter, the mother and child were involved in an automobile accident. That accident, in which the straps on the child's car seat wrapped around her neck and cut off the supply of oxygen to her brain for a substantial period of time, left the child in an irreversible coma.

As a result of the accident, the child cannot see, hear, or engage in any purposeful movement. Her ability to breathe on her own is extremely limited. A breathing tube has been inserted directly into her lungs through an incision in her trachea, and her rate of breathing is controlled by a machine. She is fed through a feeding tube permanently inserted in her stomach. The child suffered cardio-respiratory arrests as a result of aspirating food regurgitated from her stomach. She was resuscitated on these occasions by extraordinary treatment, including the administration of medication to

---

specialized 'teams' of doctors and nurses trained in the administration of cardiopulmonary resuscitative measures. If a patient goes into cardiac or respiratory arrest, the nurse in attendance causes a notice to be broadcast on the hospital's intercommunications system giving a code word and the room number. The members of the code team converge on the room immediately from other parts of the hospital." *Matter of Dinnerstein*, 6 Mass. App. Ct. 466, 469 n.3 (1978).

restart her heart. Although the child has undergone Nissen fundoplication surgery,[2] which significantly decreases the likelihood that she will regurgitate food into her lungs, she nevertheless still runs the risk of such cardiorespiratory arrests.[3]

On July 7, 1987, DSS and the child's mother jointly moved for appointment of a guardian ad litem for the child and entry of a substituted judgment decision as to what further medical care should be given to the child. Because both the child and her parents were minors, as well as under the legal custody of DSS, a guardian was appointed to represent the child.

The primary witness at the hearing for entry of substituted judgment was Dr. Stephen Lieberman, the director of the pediatric intensive care unit at Baystate Medical Center, where the child was hospitalized following the accident. Dr. Lieberman, who has extensive training and experience in treating children with neurological problems, was primarily responsible for the child from the time she was admitted to Baystate. After extensive testing, Dr. Lieberman determined that "there is nothing to indicate that she has any ability to function from her cerebral cortex. But she does function from a brain stem level where things are not under [her conscious] control."[4] He testified that the child is irreversibly in a state

---

[2]This surgical procedure involves tying off the top part of the stomach to prevent reflux of food into the esophagus and thence to the trachea, where it might be aspirated. The surgery was undertaken in response to a court order. See *infra* at 191. The issue of the correctness of the judge's substituted judgment order as to this surgical procedure is not before us.

[3]Indeed, she has required resuscitation at least once since the Nissen fundoplication surgery was performed.

[4]In other words, the child's lower brain, and not her upper brain, functions. The upper brain controls thinking and awareness. The lower brain controls only vegetative functions. Currently, only patients who have lost operation of both their upper and lower brain are classified as legally dead.

We note, however, that the definition of "death" is not static. It evolves with advances in medical technology and changes in social attitudes. Formerly, patients were declared dead when their heart and lungs ceased to function. See Black's Law Dictionary 488 (4th ed. 1968). Once the capacity to mechanically maintain cardiac and respiratory functions was devel-

of coma from which "she will never regain [consciousness or] be able to function in any way." He testified that "there is really no potential for this condition to be reversed" except through the perfection of a complete brain transplant operation. Dr. Lieberman stated that, although there is medical controversy as to whether a person functioning at a brain stem level can feel pain, in his opinion, the child does not feel pain, or at least is not "able to localize it." He testified that entry of a "no code" order was completely consistent with medical ethics.

The District Court judge, substituting his judgment for the incompetent child, found that, if competent, the child would choose not to be resuscitated by extraordinary measures. He therefore ordered that "further ventilator treatment and resuscitative measures be withheld" in the event the child "suffers respiratory distress or cardiac arrest in the future." In addition, he ordered that the Nissen fundoplication surgery be performed in order to reduce the likelihood of the child's aspirating regurgitated food.[5]

Pursuant to G. L. c. 211, § 3 (1990 ed.), the child's guardian ad litem sought relief from the District Court's DNR order before a single justice of this court. The single justice

---

oped, however, this definition was no longer adequate and was supplemented (either by statute or judicial decision) by the "total brain death" definition. See Black's Law Dictionary 360-361 (5th ed. 1979).

One commentator argues that our understanding of death should undergo another revision: when the upper brain ceases to function ("neocortical death"), the patient ought to be considered dead. According to this commentator, the values underlying the "total brain death" and "neocortical death" standard are compatible: the former, like the latter, rests on the view that consciousness is the sine qua non of human existence, since a person who is permanently unconscious will currently be declared dead even though her respiration could be mechanically maintained. K.G. Gervais, Redefining Death (Yale U. Press, 1986).

[5]DSS sought clarification of the order. In response, the District Court judge issued a supplemental order stating that the child should continue to breathe with the aid of a respirator until she experienced pulmonary or cardiac failure.

reserved and reported the matter after the parties[6] so requested and submitted a statement of agreed facts.[7] The guardian argues that: (1) the judge's factual findings with respect to the effects of full code treatment are clearly erroneous; (2) the judge's determination that the child would choose to decline resuscitative medical treatment in the event of respiratory or cardiac arrest is without support in the record and the judge's findings; and (3) even if the judge's substituted judgment determination were correct, resuscitative treatment should nevertheless be administered because the State's interest in the preservation of life outweigh's the child's desire to have a "no code" order entered on her medical charts. The guardian requests that the order placing the child on "no code" status be vacated, and that we enter a judgment that the child would choose to have all extraordinary medical treatment continue in the event of further cardiac or respiratory arrests.

*The "no code" determination.* "Cardiac arrest occurs at some point in the dying process of every person, whatever the underlying cause of death. Hence the decision whether or not to attempt resuscitation is potentially relevant for all patients." Deciding to Forego Life-Sustaining Treatment: Ethical, Medical and Legal Issues in Treatment Decisions, President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, 235

---

[6]There are three parties to this matter: the guardian ad litem; DSS; and the judge of the District Court, whose motion to be designated a nominal party was allowed.

[7]Resort to G. L. c. 211, § 3, ordinarily is inappropriate where normal appellate review is available. See *Planned Parenthood League of Mass., Inc.* v. *Operation Rescue*, 406 Mass. 701, 706 (1990); *Fogarty* v. *Commonwealth*, 406 Mass. 103, 106-107 (1989). Because a substituted judgment order is an appealable judgment, normal appellate review will usually be appropriate, see, e.g., *Brophy* v. *New England Sinai Hosp., Inc.*, 398 Mass. 417, 422 n.5 (1986); *Guardianship of Doe*, 411 Mass. 512, 515 (1991); an appellant may preserve his or her rights, where necessary, by requesting a stay pending appeal. This particular case, however, was reserved and reported pursuant to G. L. c. 211, § 3, in recognition of its importance and the fact that it is a case of first impression.

(March, 1983). It is not surprising, then, that "no code" orders have become fairly routine.[8]

Generally, "no code" orders do not require judicial oversight. See *Matter of Dinnerstein*, 6 Mass. App. Ct. 466, 474-475 (1978). Cf. *Brophy* v. *New England Sinai Hosp., Inc.*, 398 Mass. 417, 423 (1986) (unlike substituted judgment to discontinue artificial nutrition and hydration, DNR order entered on Brophy's chart at wife's request not reviewed by court). Courts should not be in the business of reviewing uncontroversial "no-code" cases simply because doctors and hospitals seek to shield themselves from liability. See Liacos, "Dilemmas of Dying," Legal and Ethical Aspects of Treating Critically and Terminally Ill Patients 149, 153 (Am. Soc'y of Law & Med., 1982) ("there is a difference between acting to preserve the interest of the patient and acting to preserve the interest of the profession"). "If hospitals ensure that decisionmaking practices are reasonable and that internal review and advice are readily available, decisions concerning resuscitation will seldom need to come before courts." Deciding to Forego Life-Sustaining Treatment, *supra* at 252.[9]

In this case, however, the minor is incompetent by virtue of both her age and irreversible coma. Further, both parents were also minors, and the mother and child were in the legal

---

[8]In a study conducted in two California hospitals, "the withholding or withdrawal of life support precipitated death in almost half of the patients who died in the [intensive care] units during the year of the study. . . . Do-not-resuscitate orders almost invariably preceded the withholding or withdrawal process." Smedira et al., Withholding and Withdrawal of Life Support from the Critically Ill, 322 N. Eng. J. Med. 309, 310 (1990).

[9]A growing number of government institutions, medical societies and hospitals, in an effort to provide patient protection and uniform procedures, have promulgated internal guidelines regarding the entry of "no code" orders. These guidelines usually include a rebuttable presumption against seeking judicial authorization for "no code" orders. See, e.g., Limiting Life-Sustaining Treatment Policy, Yale New Haven Hospital (Feb. 27, 1991) 3; Guidelines for Withholding, Withdrawing or Limiting Life-Sustaining Treatment, Including Resuscitation, Beth Israel Hospital (Sept. 1991) 3; Guidelines for Do Not Resuscitate Orders, Children's Hospital, 104.

custody of DSS. The guardian opposes the DNR order. Moreover, as in *Custody of a Minor (No. 1)*, 385 Mass. 697, 709 (1982), "the child already was within the jurisdiction of the court before the question whether a 'no code' order should be made . . . arose." In these circumstances, a judicial "no code" determination is appropriate. Cf. *id.* at 709 (where, among other factors: (1) minor patient is ward of State in DSS custody; (2) child's mental faculties have not developed to point that he is competent to make decision; (3) parents have failed to exercise parental responsibilities toward child; and (4) child already was within the jurisdiction of the court, judicial determination of ["no code"] is appropriate); *Matter of Spring*, 380 Mass. 629, 636-637 (1980) ("[O]ur opinions should not be taken to establish any requirement of prior judicial approval that would not otherwise exist. . . . [A] variety of circumstances [are] to be taken into account in deciding whether there should be an application for a prior court order with respect to medical treatment of an incompetent patient." [Circumstances include whether the patient is in State custody, the patient's level of comprehension and mental ability, and whether the patient, spouse or guardian consents to the action]).

The right of incompetent individuals to refuse medical treatment is effectuated through the doctrine of substituted judgment.[10] See, e.g., *Custody of a Minor (No. 1)*, *supra* at 697; *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728, 738-739 (1977). In making a substituted judgment determination, the court "dons 'the mental mantle of the incompetent' and substitutes itself as nearly as possible for the individual in the decision-making process . . . . [T]he court does not decide what is necessarily the best decision but rather what decision would be made by the incompetent person if he or she were competent." *Matter of Moe*, 385 Mass. 555, 565 (1982), citing *Saikewicz*, *supra* at 752, quoting *In re Carson*, 39 Misc. 2d 544, 545 (N.Y. Sup.

---

[10]Nobody disputes that the child is incompetent and that a substituted judgment decision was necessary in this case.

Ct. 1962).[11] In determining what the incompetent person's choice would be, the judge should consider: (1) the patient's expressed preferences, if any; (2) the patient's religious convictions, if any; (3) the impact on the patient's family; (4) the probability of adverse side effects from the treatment; and (5) the prognosis with and without treatment. See *Guardianship of Roe*, 383 Mass. 415, 444 (1981). The judge must also "tak[e] into account the present and future incompetency of the individual as one of the factors which would necessarily enter into the decision-making process of the competent person." *Saikewicz, supra* at 752-753. The judge should also consider any countervailing State interests, which may include: (1) the preservation of life; (2) the protection of innocent third parties; (3) the prevention of suicide; and (4) the maintenance of the ethical integrity of the medical profession. See *Norwood Hosp.* v. *Munoz*, 409 Mass. 116, 125 (1991); *Saikewicz, supra* at 741; *Spring, supra* at 641. The judge may consider any additional factors which appear to be relevant. *Rogers* v. *Commissioner of the Dep't of Mental Health*, 390 Mass. 489, 506 (1983).[12]

With respect to the foregoing factors, the judge found the following facts. Because of her infancy, the child had not expressed any wishes from which the judge could draw guidance. "[B]ecause of the absence of natural family involvement there is no information regarding the child's ethical,

---

[11]We have noted that, in cases like this one involving incompetent children, "the substituted judgment doctrine is consistent with the 'best interests of the child' test. It is true that, when applying the 'best interests' test, the inquiry is essentially objective in nature, and the decisions are made not by, but on behalf of, the child. . . . Nevertheless, the best interests analysis, like that of the substituted judgment doctrine, requires a court to focus on the various factors unique to the situation of the individual for whom it must act. . . . As a practical matter, the criteria to be examined and the basic applicable reasoning are the same." (Citation omitted.) *Custody of a Minor (No. 1)*, 385 Mass. 697, 710 n.10 (1982), quoting *Custody of a Minor*, 375 Mass. 733, 753 (1978).

[12]The judge did not address two other State interests, the protection of innocent third parties and prevention of suicide, as they are not relevant to this case. See *Doe, supra* at 522. The guardian does not contest the fact that these considerations are irrelevant.

moral or religious values that the Court could examine."
There would be little, if any, impact on the child's family
because the family was never intact.[13] "[T]he implications of
a full-code effort would involve a substantial degree of bodily
invasion."[14] If the infant were to experience cardiac or re-
spiratory arrest, in the absence of extraordinary measures,
the child might die. Even with the full-code treatment, "the
prognosis for the child . . . would remain terminal because of
the untreatable 'brain-dead' condition." The child "has made
no gains during her long hospitalization;" "at best [she] will
live for an indefinite period in a vegetative coma without any
real hope of improvement, and as to the brain damage itself
the prognosis is hopeless."[15] The judge's findings, excluding
the one for which there is no support, see note 15, *supra*, are
sufficient to support the determination that the child would
refuse resuscitative measures in the event of cardiac or re-
spiratory arrest.

Arguing that the child has no dignity interest in being free
of bodily invasions, the guardian states that the child "has no
cognitive ability and therefore will suffer no 'indignity' that

---

[13]We have said that the impact on the ward's family "is primarily rele-
vant when the patient is part of a closely knit family." *Rogers* v. *Commis-
sioner of the Dep't of Mental Health*, 390 Mass. 489, 505 (1983), citing
*Roe, supra* at 446.

[14]Resuscitation techniques are described in *Dinnerstein, supra* at 468:
"Such efforts typically involve the use of cardiac massage or chest com-
pression and delivery of oxygen under compression through an endotra-
cheal tube into the lungs. An electrocardiogram is connected to guide the
efforts of the resuscitation team and to monitor the patient's progress. Va-
rious plastic tubes are usually inserted intravenously to supply medications
or stimulants directly to the heart. Such medications may also be supplied
by direct injection into the heart by means of a long needle. A defibrillator
may be used, applying electric shock to the heart to induce contractions. A
pacemaker, in the form of an electrical conducting wire, may be fed
through a large blood vessel directly to the heart's surface to stimulate
contractions and to regulate beat."

[15]The judge also found that "there exists a high probability of adverse
neurological effects and serious brain damage, were the infant subjected to
the vigors of a full-code treatment." This finding is not supported by the
evidence. It is not crucial to the judge's substituted judgment
determination.

the medical care might be supposed to produce in a conscious person." "Cognitive ability" is not a prerequisite for enjoying basic liberties. In the law of this jurisdiction, incompetent people are entitled to the same respect, dignity and freedom of choice as competent people. See *Guardianship of Roe*, 411 Mass. 666, 672 (1992); *Moe, supra* at 566, *Custody of a Minor (No. 3)*, 378 Mass. 732, 745 (1979); *Saikewicz, supra* at 745.

The guardian also argues that, in any event, "the necessity for the bodily invasions occasioned by the efforts to resuscitate have been greatly reduced by [the Nissen fundoplication] surgery." The fact that the invasions may be less frequent than before the surgery does not make any particular invasion less likely to offend the child's dignity.

The guardian claims that "treatment would not occasion any financial disruption of the ward's family, nor involve emotional disturbance which the ward would, if competent, find compelling." Although the guardian proposes that lack of financial disruption counsels in favor of continued treatment, we hardly think the guardian would accept the converse proposition. As we recently stated in *Doe, supra* at 520 n.15, "[t]he judge quite properly did not consider whether [the patient's] continued care would pose a burden of any kind on anyone. The cost of care in human or financial terms is irrelevant to the substituted judgment analysis." The guardian's second claim is controverted most strongly by the fact that both the child's mother and father have expressed their desire that extraordinary measures not be used to prolong the child's life. The mother testified: "I don't like to see her going through, suffering that she's going through . . . . I know what she was like before this accident. She was a very healthy baby, always smiling . . . and she's just laying there doing nothing, and it's not like my daughter." Moreover, the emotional disturbance which the ward herself, if competent, would experience as a result of her condition cannot be underestimated. Last, contrary to the guardian's assertions, there is no evidence that the decision to enter the "no code"

order reflects the judge's own judgment about the quality of the child's life.[16]

The guardian alternatively argues that, assuming that the judge was correct in deciding that the child would choose to refuse resuscitation, the State's interest in the preservation of life outweighs the child's wishes. As we have stated on previous occasions, the State's general interest in the preservation of life is not absolute. Here, as in *Saikewicz, supra* at 742, "[t]he interest of the State in prolonging a life must be reconciled with the interest of an individual to reject the traumatic cost of that prolongation. There is a substantial distinction in the State's insistence that human life be saved where the affliction is curable, as opposed to the State interest where, as here, the issue is not whether, but when, for how long, and at what cost to the individual that life may be briefly extended." The substituted judgment decision and the entry of the "do not resuscitate" order are affirmed.

*So ordered.*


NOLAN, J. (dissenting). A person is not obligated to take extraordinary means to prolong his life and, therefore, persons acting in behalf of others who are faced with such a decision are not required to invoke extraordinary means.

However, the court again has approved application of the doctrine of substituted judgment when there is not a soupçon of evidence to support it. The trial judge did not have a smidgen of evidence on which to conclude that if this child who is now about five and one half years old were competent

---

[16]The guardian advances as another reason for opposing the "no code" order that "the treatments will keep her alive indefinitely so that should medical advances occur, however unlikely that may at present appear to be, she will be here to take advantage of them." We reject this argument. By this logic, we must mechanically maintain with respirators and ventilators all people whom current medicine classifies as dead, in the hope that one day medical treatment will become available to remedy their condition. We note that the guardian's suggestion is inconsistent with current medical practice. See guidelines cited in note 9, *supra.*

to decide, she would elect certain death to a life with no cognitive ability. The route by which the court arrives at its conclusion is a cruel charade which is being perpetuated whenever we are faced with a life and death decision of an incompetent person. See *Guardianship of Doe*, 411 Mass. 512, 525-530 (Nolan, J., dissenting).

I dissent.