## CARE AND PROTECTION OF SHARLENE.

Suffolk. December 6, 2005. - January 17, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Constitutional Law,* Self-incrimination. *Parent and Child,* Equitable parent doctrine. *Juvenile Court,* Withholding medical treatment. *Privacy. Practice, Civil,* Standing, Impoundment order. *Uniform Rules on Impoundment Procedure. Public Records. Medicine,* Withholding medical treatment. *Words,* "De facto parent."

In a care and protection proceeding concerning a child in an irreversible vegetative state whose adoptive mother (and only legal guardian) was deceased and whose biological father absented himself from her life, the petitioner, who was the child's stepfather (and who had been criminally charged with the assault and battery on the child that allegedly had resulted in her current vegetative state), did not establish that he was the child's de facto parent, where he proffered no evidence that would allow a conclusion that his participation in the child's life was of a loving or nurturing nature, or even that it was beneficial to the child, and the judge was well within his authority in drawing a negative inference from the petitioner's invocation of his right not to testify with respect to his knowledge of the manner in which the child's injuries were inflicted [766-768]; therefore, the petitioner was not entitled to participate in a medical end-of-life decision for the child and lacked standing, as a de facto parent or otherwise, to challenge the judge's proposed order, jointly requested by the child's counsel and the Department of Social Services, regarding the removal of life support from the child, which order resulted from an evidentiary hearing where the judge applied the substituted judgment standard, properly considered the traditional best interests of the child test, and entered specific findings on the appropriate factors he carefully considered [768-770]; further, the judge properly ruled that the findings and order of that hearing remain impounded and unavailable to the general public [770-773]. SPINA, J., concurring, with whom COWIN, J., joined.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on October 7, 2005.

The case was reported by *Cowin,* J.

*John J. Egan & John M. Thompson (Edward J. McDonough, Jr.,* with them) for the petitioner.

*Virginia A. Peel,* for Department of Social Services.

*Lisa M. Kling* for Sharlene.

*Pamela J. Szmyt Hastings,* Committee for Public Counsel Services, for the siblings of Sharlene, amici curiae, submitted a brief.

GREANEY, J. This case is before us on a reservation and report, without decision, by a single justice of this court. The petitioner is the stepfather of an eleven year old child (whom we shall refer to by the pseudonym Sharlene) who was admitted to Baystate Medical Center (Baystate) on September 11, 2005, with critical injuries. As a result of her injuries, Sharlene remains in an irreversible vegetative state. On September 13, the Department of Social Services (department) filed a care and protection petition, pursuant to G. L. c. 119, § 24, and received custody of Sharlene. Counsel and a guardian ad litem (GAL) were appointed for Sharlene. On September 22, Sharlene's adoptive mother, and only legal guardian, died. On September 26, a judge in the Juvenile Court denied a motion filed by the petitioner (who has been criminally charged with assault and battery on Sharlene[1]) to be declared the child's de facto parent. On October 5, after a closed evidentiary hearing, which the petitioner's counsel attended, but in which he was not allowed to participate, a judge allowed an emergency motion filed jointly by the department and Sharlene's counsel (joint emergency motion), requesting an order that the child's health care providers withdraw all life support measures currently in place and make no attempt to resuscitate her on the occurrence of cardiac or respiratory arrest (DNR order). The judge further ordered that his written decision allowing the joint emergency motion be impounded and released only to the department, Baystate, Sharlene's counsel, and Sharlene's GAL. The petitioner challenged the impoundment order and, after an evidentiary hearing on October 17, the judge modified that order to provide that his decision be made available only to persons connected with the case, including the petitioner, but not to the general public.

In a petition filed pursuant to G. L. c. 211, § 3, the petitioner challenges the denial of his motion for de facto parental status

---

[1]The petitioner asserts that the criminal case pending against him is in connection with injuries that were inflicted on Sharlene sometime prior to the injuries that have hospitalized her in her present condition.

and seeks a new hearing on the joint emergency motion, in which he, as Sharlene's de facto parent, has a voice. He also argues that the public should be allowed access to all proceedings (except for a new hearing, should one be ordered by this court) and all relevant documents in this case. We have carefully examined the record and the GAL report (which we requested and received from the Juvenile Court) and have ordered and listened to recordings of the hearings that took place. For reasons stated in this opinion, we affirm the denial of the petitioner's motion to be declared Sharlene's de facto parent and conclude that the petitioner properly was excluded from participation in the hearing on the emergency joint motion. As to the public access issue raised in the petition, we seriously question whether someone in the petitioner's position has standing to assert such a claim on behalf of the public. We nevertheless consider, and reject, the claim and affirm the judge's order that the documents relevant to this case should not be used for further publication without a specific order by the judge. We also have before us the order to withdraw life support currently in place for Sharlene and to refrain from resuscitation. We affirm that order as well.

We will begin by summarizing the relevant facts of Sharlene's life. We then will describe, in some detail, the procedural history of this case. Finally, we will address the substantive issues raised by the petition.

Sharlene was born on February 24, 1994. Her biological mother was sixteen years old and not married to Sharlene's biological father.[2] When Sharlene was four years of age, she was sent to live with her aunt (who would later become her adoptive mother). That same year, based on a determination that Sharlene had been sexually abused by her biological mother's boy friend, the department sought and received custody of Sharlene, but allowed Sharlene to remain in her aunt's home as a foster child. The petitioner began living in the home in February, 2000, and married Sharlene's aunt in September, 2001. In October, 2001, Sharlene was adopted by her aunt (hereinafter, adoptive mother) as a single parent.

---

[2]The biological father has been absent from Sharlene's life and has no role in this case.

The GAL report, which was submitted to the judge in connection with the joint emergency motion, contains a considerable amount of information dealing with developmental and social difficulties with which Sharlene struggled throughout her young life. This information appears to have been gathered from the department's reports, the authenticity of which was never established. We therefore omit the information for purposes of this opinion. The GAL report did disclose that multiple reports have been filed with the department, pursuant to G. L. c. 119, § 51A, involving Sharlene and her two siblings,[3] since January, 2001. The GAL report set forth the following chronological history of child abuse reports and investigations involving Sharlene alone:

"9/27/02 Child Abuse/Neglect Report. Allegations of neglect and physical abuse of [Sharlene] Screened Out.[4]

"10/24/02 Child Abuse/Neglect Report. Screened in for allegations of neglect and physical abuse of [Sharlene]. Reporter saw bruises on child, concerns about how child is disciplined and child out of school for eight days.

"10/25/02 Child Abuse/Neglect Investigation. Unsupported[5] with no reasonable cause to believe that a condition of neglect or physical abuse exists.

"1/6/03 Child Abuse/Neglect Report. Initially screened in for neglect because mother is unable to keep child safe from harm then screened out as [care and protection] referral made.

"12/30/03 Child Abuse/Neglect Report.

---

[3]Sharlene's siblings, who are nine and two years of age, are the biological children of Sharlene's adoptive mother. The younger child is the biological child of the petitioner.

[4]The department "screens" allegations of abuse or neglect contained in reports under G. L. c. 119, § 51A. To "screen [in]" means to identify children at risk of abuse or neglect by a caretaker, and to distinguish the need for a nonemergency or emergency response. 110 Code Mass. Regs. § 4.21 (2000). To "screen out" means to determine that the allegations of abuse or neglect by a caretaker contained in the report are unsubstantiated.

[5]To "[s]upport" means to find after an investigation that there is reasonable cause to believe a report that a child has suffered abuse or neglect inflicted by a caretaker. 110 Code Mass. Regs. § 2.00 (1996).

"1/13/04 Child Abuse/Neglect Report. Allegations of neglect screened out.

"2/23/04 Child Abuse Neglect Report. Screened in on allegations of neglect. 10 year old [Sharlene] missing for two hours and finally located in bathroom at Noble Hospital which is not close to her home.

"2/23/04 Child Abuse/Neglect Investigation. Unsupported. Child did run away from home but mother acted appropriately.

"6/11/04 Child Abuse/Neglect Report. Screened in because [Sharlene] had bruises, not in school and does not look as well cared for as other children in the home.

"6/14/04 Child Abuse/Neglect Investigation. Allegations of physical abuse and neglect unsupported. [Sharlene] reports that she bruised her face diving into a pool. Mother responsive to [Sharlene's] self-abusive behaviors by bringing her to pediatrician and following counselor's recommendations.

"6/18/04 Child Abuse/Neglect Report. Screened in for neglect initially and then screened out. Mother addressing issues with child's therapist, mother agreed to voluntary services, child hospitalized and mother working with therapist to get child placed in residential care.

"6/25/04 Child Abuse/Neglect Report. Mother's application for voluntary services accepted.

"7/15/04 Child Abuse/Neglect Report. Screened in for physical abuse and neglect of [Sharlene] by her mother. [Sharlene] has bruises on arm.

"7/15/04 Child Abuse/Neglect Investigation. Supported for neglect, mother inadequately supervised [Sharlene] in store despite prior history of [Sharlene] stealing in a store.

"7/16/04 Child Abuse/Neglect Report. Screened in. Case currently open for voluntary services and investigation.

"8/18/04 Child Abuse/Neglect Report. Screened in for

neglect. Child received burns during a bath then screened out because department is currently involved with family and closely monitoring [Sharlene's] care.

"1/14/05 Child Abuse/Neglect Report. Screened out.

"4/14/05 Child Abuse/Neglect Report. Screened in due to concerns about the level of supervision provided for [Sharlene] given the extent of her injuries in light of her history.

"4/14/05 Child Abuse/Neglect Investigation. Allegations of Neglect unsupported.

"5/11/05 Child Abuse/Neglect Report. Screened in due to allegations of neglect. Mother did not seek medical attention when [Sharlene] complained of a headache and was vomiting. Mother left [Sharlene] alone at softball game and she was hit in the head with a baseball bat.

"5/11/05 Child Abuse/Neglect Report. Allegation of neglect unsupported. Incident was an accident. Adequate services in place to assist with monitoring.

"9/11/05 Child Abuse/Neglect Report. Screened in for abuse by unknown perpetrator based upon the child's multiple bruises and fractures in different stages of healing.

"9/12/05 Child Abuse/Neglect Investigation. Supported. Reasonable cause to believe that a condition of physical abuse and neglect exists. [Sharlene] sustained serious life threatening injuries which were the result of trauma."[6]

The final allegation of child abuse was filed on behalf of Sharlene on September 11, 2005. On that day, Sharlene was brought in a comatose state to a hospital in Westfield with multiple bruises all over her body in different stages of healing, "crusted areas" on her chest, a fractured nose, and multiple old fractures, also all over her body. She was transported to nearby

[6]In spite of receiving a total of fifteen G. L. c. 119, § 51A, reports over a period of three years, all alleging that Sharlene was an abused or neglected child, it was not until the last report was filed that allegations of abuse were determined to be supported. That determination came too late to protect Sharlene.

Baystate, and there was diagnosed with a severe traumatic brain injury, manifested clinically by fixed and dilated pupils, complete unresponsiveness, and a body temperature of eighty-five degrees. A CT scan of Sharlene's brain revealed a right-sided subdural hematoma and a magnetic resonance image (MRI) revealed hemorrhagic contusion of the brain stem and shear injury of the brain, including the corpos callosum (high force injury). Sharlene was intubated and placed on a respirator for breathing and a feeding tube was inserted into her nose. She has been in a vegetative state and on life support since that time. It was the opinion of one of Sharlene's physicians that her injuries could not have been self-inflicted.

On September 13, the department named the petitioner and Sharlene's adoptive mother in the care and protection petition referred to above,[7] and, as has been stated, counsel for Sharlene and a GAL were appointed. The department received temporary custody of Sharlene at that time. See G. L. c. 119, § 24. On September 19, the department and Sharlene's counsel filed the joint emergency motion requesting the DNR order that has been described above. The joint emergency motion also requested the judge to expand the role of Sharlene's GAL to focus on evaluating whether the requested DNR order should issue.

Sharlene's adoptive mother and the petitioner were arraigned in the Westfield Division of the District Court Department on charges relating to injuries that Sharlene allegedly sustained at their hands. The mother was released on bail on September 22, and died later that day, apparently, as the result of a murder-suicide or double suicide.[8]

On September 26, the petitioner filed a motion requesting to

[7]Sharlene's siblings were also subjects of the petition and remain parties to the ongoing care and protection proceeding. Their counsel has been involved, to some degree, in the proceedings leading up to this case, including attending the hearing on the joint emergency motion, and filing a petition to this court, pursuant to G. L. c. 211, § 3, seeking access to the judge's written decision regarding his order allowing that motion.

The siblings are not, however, parties to this case. Their counsel has filed an amicus brief on their behalf to present their point of view on the impoundment issue. In their brief, the siblings assert that the judge properly ordered that the general public be excluded from the proceedings arising out of the joint emergency motion.

[8]From newspaper accounts, it appears that the mother's body and that of

be declared Sharlene's "de facto" parent.[9] That day, the judge held a hearing on the motion at which he considered the arguments of the petitioner and the department. Through counsel, the petitioner described his relationship with Sharlene during the four years in which he had lived in the home. The petitioner proffered that he had supported her financially, had attended her dance recitals, had taught her how to perform minor repair jobs around the house, and generally took an interest in her welfare. He stated that Sharlene had no other father figure during the four years he lived in the house, and pointed out that, to her friends, Sharlene referred to him as "her father, her dad." The petitioner conceded that he did not perform a majority of Sharlene's parenting functions, but insisted, essentially, that he did the best that he could. When questioned by the judge as to whether he would testify to his knowledge of Sharlene's injuries and the manner in which they were inflicted, the petitioner informed the judge that he would assert his privilege against self-incrimination under the Fifth Amendment to the United States Constitution.

In opposition to the petitioner's motion, the department argued that, in the four years that the petitioner had lived in the home, the department had interviewed him only once as part of a home visit, because he was not "available." Sharlene's counsel further attested that, by his own statements to police, when the petitioner left home in the afternoon of September 10 (the day before Sharlene was brought to the hospital), he was aware that the child had been injured and was throwing up. He, nonetheless, told the police that he took no steps to check on Sharlene's condition until the following afternoon. Sharlene's counsel argued to the judge, "[T]hat is not a parent, under any circumstances." She also pointed out that Sharlene had old, as well as recent, severe injuries that occurred while the petitioner lived in the house, and "throughout that time, [the petitioner] had to be aware of those and had to have some knowledge of what was going on in the house. And if in fact he was acting as

---

the mother's grandmother were discovered at the same time.

[9]The petitioner also requested in the motion to be declared the "de facto" parent of Sharlene's nine year old sister. The judge denied the motion as to both children. The petitioner has appealed from the denial of his motion only insofar as it pertains to Sharlene.

a de facto parent, he was either participating in the infliction of those injuries or totally ignoring the fact."

The judge concluded that, based on the good faith offers of proof before him, the petitioner had not demonstrated that he is Sharlene's de facto parent.[10] Crediting all of the petitioner's proffered evidence, the judge found that the petitioner did not provide a majority of the caretaking functions of the child. The judge drew a negative inference from the petitioner's assertion that he would not testify at an evidentiary hearing as to Sharlene's injuries. The judge further concluded that, because the petitioner is not the legal, adoptive, putative, or de facto father of Sharlene, he would not be allowed to participate as a party in the hearing on the joint emergency motion. As a "courtesy" the judge stated he would allow the petitioner's counsel, and counsel for Sharlene's siblings, to be present at the hearing but not to participate.

On September 30, an evidentiary hearing took place at Baystate in which the judge considered the joint emergency motion requesting a DNR order for Sharlene.[11] The judge heard testimony from two of Sharlene's physicians at Baystate, one of Sharlene's nurses at Baystate, Sharlene's department social worker, and Sharlene's GAL. He also considered Sharlene's medical record from Baystate and a report filed that day by her GAL, which documented background information on Sharlene's life, but focused primarily on what should be done for Sharlene at this time.[12] As has been indicated, the petitioner's counsel was allowed to attend, but not participate in, this hearing.

One physician, the director of Baystate's pediatric intensive

---

[10]The written findings of fact on the judge's decision are contained in subsequent written findings of fact entered after the October 5 hearing on the joint emergency motion and the October 17 hearing on the petitioner's challenge to the impoundment issue. The substance of the two written findings is the same.

[11]The motion considered was a supplemental motion, filed jointly that day by the department and Sharlene's counsel that did not alter the substance of the original motion but contained additional facts and legal arguments.

[12]The GAL report concluded, "[Sharlene's] life as she knew it, for better or worse, is over and can never be recovered. While the choice to withhold artificial ventilation, medication, fluid and nutrition is not an easy one that can be made lightly, it is the only decision that will afford [Sharlene] the chance to die quickly and with dignity."

care unit (PICU), testified that Sharlene suffered from a "shear" injury to her brain stem that caused a disruption of nerve fibers in that portion of her brain and resulted in irreparable brain damage. He testified that, after Sharlene's admission to Baystate, her intracranial pressure increased due to a stroke of the entire right side, and most of the left side, of her brain. He further testified that Sharlene is in an irreversible coma. The physician explained that, when an injury occurs to the upper brain there are other parts of the upper brain that may be able to take over the function in time. With an injury to a brain stem, however, there is no chance of recovering cognitive or sensate functioning. The physician testified that, "short of developing the technique for a complete brain transplant, there is no hope that medical treatment will be discovered in the foreseeable future which could reverse [Sharlene's] condition." Sharlene's treating physician, the associate director of Baystate's PICU, testified that Sharlene's brain is operating at a primitive level, and that the child cannot see, hear, feel, or respond.[13]

Both physicians supported the issuance of an order that Sharlene not be resuscitated on the occurrence of cardiac or respiratory failure. With respect to the withdrawal of her life support, however, their opinions differed. Sharlene's treating physician recommended both the removal of the ventilator and her feeding tube. The director of the PICU, on the other hand, recommended removal of the ventilator only and expressed opposition to the removal of her feeding tube. The physicians agreed that, with the feeding tube, Sharlene's death would likely occur anytime from several weeks up to two months. Without the feeding tube, Sharlene's death would likely occur in a substantially shorter period of time. The director of the PICU testified that the removal of life support in this case would not be contrary to prevailing medical ethics.

On October 5, the judge entered a written decision, in which he made findings of fact and concluded that "[Sharlene's] dignity and quality of life would be most respected by withdrawing both the ventilator and the feeding tube along with the issu-

---

[13]The physician testified that Sharlene cannot make any purposeful movements but, occasionally, will make a "base" movement in response to being touched.

ance of a [DNR] order, with great sadness I so issue this day."
The judge also ordered that his written decision not be released
to anyone except Sharlene's counsel, her GAL, the department,
and Baystate.

The petitioner filed a petition for relief pursuant to G. L.
c. 211, § 3, seeking access to the impounded decision. In
response to an order of a single justice of this court, the judge
held an evidentiary hearing, on October 17, concerning his
impoundment order. At the hearing, the petitioner argued that
the order should be vacated in its entirety and that all of the
proceedings and court records concerning Sharlene be opened
to the general public. The judge decided to modify the order to
permit counsel for the petitioner to view the October 5, 2005,
findings of fact, conclusions of law, and order allowing the
DNR and withdrawal of life support. The department and Shar-
lene's counsel assented to the judge's proposal, and the order
was so modified. The judge made written findings of fact and
conclusions of law regarding the modification of his October 5
impoundment order and ordered that the petitioner be provided
a copy of his written findings and order allowing the joint mo-
tion for a DNR and withdrawal of support order. The judge
made clear, however, that the written decision was "not to be
used for further publication without specific order of this court."

1. We address first the petitioner's assertion that he is Shar-
lene's "de facto" parent. This court expressly adopted the
concept of "de facto" parenthood in *E.N.O.* v. *L.M.M.*, 429
Mass. 824, cert. denied, 528 U.S. 1005 (1999). In that case, we
defined a "de facto parent" as "one who has no biological rela-
tion to the child, but has participated in the child's life as a
member of the child's family. The de facto parent resides with
the child and, with the consent and encouragement of the legal
parent, performs a share of caretaking functions at least as great
as the legal parent." *Id.* at 829, citing *Youmans* v. *Ramos*, 429
Mass. 774, 776 & n.3 (1999), and ALI Principles of the Law of
Family Dissolution § 2.03 (1) (b) (Tent. Draft No. 3 Part 1
1998). In *Blixt* v. *Blixt*, 437 Mass. 649 (2002), cert. denied,
537 U.S. 1189 (2003), we noted (without adopting) further
refinements to the concept — that a de facto parent must live
with the child for not less than two years and that the caretak-

ing relationship have been established "for reasons primarily other than financial compensation, and with the agreement of a legal parent to form a parent-child relationship, or as a result of a complete failure or inability of any legal parent to perform caretaking functions." *Id.* at 659 n.15, quoting ALI Principles of the Law of Family Dissolution § 2.03(c) (Tent. Draft No. 4 2000).

Our cases, and those of the Appeals Court, addressing the concept have focused exclusively on the existence of a significant preexisting relationship that would allow an inference, when evaluating a child's best interests, that measurable harm would befall the child on the disruption of that relationship. See, e.g., *T.F.* v. *B.L.*, 442 Mass. 522, 533 (2004); *Blixt* v. *Blixt, supra* at 659; *E.N.O.* v. *L.M.M., supra*; *Youmans* v. *Ramos, supra*; *Dearborn* v. *Deausault*, 61 Mass. App. Ct. 234, 238 (2004); *Sayre* v. *Aisner*, 51 Mass. App. Ct. 794, 800-801 (2001). See also *Eccleston* v. *Bankosky*, 438 Mass. 428, 439 n.17 (2003) (declining to consider whether "de facto" parent may be held financially responsible for child). The standard established by these cases presumes that the bond between a child and a de facto parent will be, above all, loving and nurturing.

We agree with the judge that the petitioner has not established that he is Sharlene's de facto parent. Beyond his unsupported statement in his brief that "[h]e felt in his heart that he was her father and she felt that way toward him," the petitioner has proffered no evidence that would allow a conclusion that his participation in Sharlene's life was of a loving or nurturing nature, or even that it was beneficial to the child. See *C.O.* v. *M.M.*, 442 Mass. 648, 654-656 (2004) (in civil adversary proceedings, burden on moving party to establish facts by preponderance of evidence). We reject the petitioner's claim that the judge erred in drawing a negative inference from the petitioner's intention to invoke his right not to testify with respect to his knowledge of the manner in which Sharlene's injuries were inflicted. The judge acted well within his authority in drawing the inference. The privilege against self-incrimination applicable in criminal proceedings is not applicable to child custody proceedings. See *Custody of Two Minors*, 396 Mass. 610, 616 (1986). See also *Shafnacker* v. *Raymond James &*

*Assocs.*, 425 Mass. 724, 735 (1997). The petitioner suggests in his brief that any criminal charges that may be pending against him "are not relevant to the de facto parent issue, but to whether he was a fit parent." This bald assertion utterly misapprehends the concept of de facto parenthood. The petitioner stands charged with criminal assault in connection with injuries inflicted on Sharlene. See note 1, *supra.* To recognize the petitioner as a de facto parent, in order that he may participate in a medical end-of-life decision for the child, is unthinkable in the circumstances of this case and would amount to an illogical and unprincipled perversion of the doctrine.

2. Because the petitioner has no legal or equitable status, as a de facto parent or otherwise, with respect to Sharlene, he has no right to participate in medical decisions affecting the child. Such decisions are within the scope of the custodial powers of the department. See G. L. c. 119, § 21.[14] See also *Care & Protection of Jeremy*, 419 Mass. 616, 620 n.7 (1995). For decisions involving extraordinary medical care of a child in its custody, such as an order to give or withhold life-prolonging treatment, the policy of the department is to seek prior judicial approval and, in addition, the appointment of a GAL to investigate whether an order for such treatment should enter. See 110 Code Mass. Regs. §§ 11.13, 11.17 (1993); 110 Code Mass. Regs. § 11.18 (1995). At the request of the department and Sharlene's counsel, the judge conducted an evidentiary hearing to make a "substituted judgment" determination on the merits of the joint emergency motion and requested order that would permit Sharlene's medical providers to withdraw her life support and to refrain from resuscitating her. See *Care & Protection of Beth*, 412 Mass. 188, 194-195 (1992); *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728, 738-739 (1977). In these circumstances, such a judicial determination is appropriate. See *Matter of Moe*, 385 Mass. 555, 565 (1982), quoting *Superintendent of Belchertown State Sch.* v. *Saikewicz*, *supra* at 752 ("the court dons 'the mental mantle of the

[14]At the time that the department and Sharlene's counsel filed the joint emergency motion, Sharlene was in the department's temporary custody. See G. L. c. 119, § 24. At the time of the hearing on the motion, Sharlene was (and continues to be) in the permanent custody of the department. See G. L. c. 119, § 26.

incompetent' and substitutes itself as nearly as possible for the individual in the decision-making process. . . . [T]he court does not decide what is necessarily the best decision but rather what decision would be made by the incompetent person if he or she were competent"); *Guardianship of Roe*, 383 Mass. 415, 444 (1981) (judge should consider [1] patient's expressed preferences, if any; [2] patient's religious convictions, if any; [3] impact on patient's family; [4] probability of adverse side effects from treatment; and [5] prognosis with and without treatment). See also *Norwood Hosp.* v. *Munoz*, 409 Mass. 116, 125 (1991) (judge also should consider countervailing State interests, including preservation of life, protection of innocent third parties, and maintenance of ethical integrity of medical profession). At the hearing, the judge applied the "substituted judgment" standard and properly considered as well the traditional "best interests of the child" test. See *Care & Protection of Beth, supra* at 195 n.11 (noting that substituted judgment doctrine consistent with "best interests of the child" test); *Custody of a Minor (No. 1)*, 385 Mass. 697, 710 n.10 (1982), quoting *Custody of a Minor*, 375 Mass. 733, 753 (1978).

The judge carefully considered the factors required by our cases, set forth above, under the settled preponderance of the evidence standard. See *Guardianship of Doe*, 411 Mass. 512, 523-525, cert. denied sub nom. *Doe* v. *Gross*, 503 U.S. 950 (1992). We summarize his determinations.[15] The proposed order was requested in good faith and not for "administrative convenience." Sharlene is unable to express any preference regarding the requested order. Sharlene is Catholic, although there was no evidence that she, or her family, actively practiced that faith or that Sharlene held any religious beliefs or convictions that would preclude the requested order. Sharlene's legal mother is deceased, and the rights of her biological parents had been terminated. Sharlene's biological mother and maternal grandmother both support Sharlene's removal from life support. Sharlene is in an irreversible and permanent coma, with the least amount of brain function that a person can have and still

---

[15]As a preliminary matter, the judge found Sharlene to be incompetent. No one questions this determination.

be considered alive. She is not aware of her surroundings and does not experience pain or discomfort. The judge concluded that if Sharlene could rationally consider her current medical condition, and her future prognosis, she would accept the joint request of the department and her counsel to enter the order.

The petitioner has no standing to challenge the judge's findings on this matter or his order to withdraw life support or to refrain from resuscitating the child. The order is the product of careful consideration by an experienced judge who heard from all interested parties, who received a comprehensive and thoughtful GAL report, and who entered specific findings on the appropriate factors he considered. See *Guardianship of Doe*, *supra* at 524.[16] Counsel for Sharlene did not oppose the order, nor did Sharlene's existing family members. The medical evidence is incontrovertible — the child is in a persistent vegetative state and there is no medical treatment in the foreseeable future that can restore her cognitive abilities. No provision of medical ethics is violated by the order. As the GAL report notes: "To all extent and purpose [Sharlene] has already left this world consciously and subconsciously and the only real remaining question is under what circumstances she'll be allowed to leave it physically."

3. We now turn to the petitioner's challenge to the impound-

---

[16]As has been discussed above, the judge applied the "substituted judgment" standard and "best interest of the child" test as set forth in *Care & Protection of Beth*, 412 Mass. 188, 194-195 & n.11 (1992). The "substituted judgment" standard is somewhat awkward in a case like this involving a young child who is not old or mature enough to have expressed her wishes on some of the factors. It might be argued that a matter of withdrawal of medical treatment in such a case is more properly left to a decision by the treating physicians, in consultation with such family as the child may have, and consideration of the provisions of medical ethics, under the standards set forth in *Matter of Dinnerstein*, 6 Mass. App. Ct. 466, 475 (1978). In circumstances such as here, however, where a child in the department's custody cannot speak for herself and no interested party opposes the order, an objective evaluation of the child's "best interests," with special emphasis on the quality of the child's life, see *Yannas* v. *Frondistou-Yannas*, 395 Mass. 704, 711 (1985), and any other factors pertinent to the child, provides critical guidance for a judge charged with the ultimate end of life decision. Here, the child's biological mother, her grandmother, and her two siblings do not oppose the order and have not come forward with any information that would allow an inference that life support to maintain Sharlene's irreversible comatose condition would be in her best interests.

ment order, a challenge that is based, as far as we can tell, on the proposition that "end of life" issues involving the courts should be resolved in the full light of public disclosure. According to the petitioner, "[t]he public ought to be in a position to judge whether the [department] succeeded or failed in its supervision of this family." The petitioner requests that this court vacate the impoundment order entered by the judge and enter a new order requiring that all the proceedings in this case (except the actual hearings) be open to the public and that all documents relevant to this case be accessible by the public.

As a preliminary matter, we find the standing of the petitioner to assert the rights of the general public in this case to be highly questionable. The essence of standing, as it pertains to a private person, is whether the person has alleged a personal stake in the outcome of a controversy. See *Arlington Heights* v. *Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977); *Ginther* v. *Commissioner of Ins.*, 427 Mass. 319, 323 (1998). As has been made clear in this opinion, his status as a party to the care and protection petition does not entitle him to any special status with respect to Sharlene or court records relating to her medical care. The petitioner is not a member of the general public in the context of this case, but one who has been criminally charged with inflicting injuries on Sharlene. Further, the issue is not as the petitioner states it — whether the department has succeeded or failed in its relationship with Sharlene. Rather, the issue involves the propriety of an order to withdraw medical treatment. In an abundance of caution, we shall nevertheless consider the merits of the impoundment order.

The Legislature has expressly directed that all care and protection proceedings be closed to the public. See G. L. c. 119, § 38 ("All hearings under [§§ 1-37], inclusive, shall be closed to the general public and it shall be unlawful to publish the names of persons before the court in any hearing provided for therein . . ."). Consistent with this directive, the Juvenile Court issued a standing order that Juvenile Court "case records and reports are confidential and are the property of the court. Reports loaned to or copied for attorneys of record, or such other persons as the court may permit, shall be returned to the court after their use or at the conclusion of the litigation, whichever occurs first.

Said reports shall not be further copied or released without permission of the court." Juvenile Court Standing Order 1-84. The authority of the Juvenile Court to promulgate standing orders, pertinent to the practice and procedure for conducting the business of the court, is derived from G. L. c. 218, § 60, which makes such orders effective "subject to the approval of the supreme judicial court."

Standing Order 1-84 was approved by this court and adopted on May 8, 1984. This order, which unambiguously makes all Juvenile Court case records the property of the court, makes sense. If the hearings are closed, pursuant to G. L. c. 119, § 38, in order to protect the confidentiality of the parties, yet the relevant documents remain unsealed, there is no way to protect the confidentiality of the parties, the purpose for which the statute was designed. By maintaining confidentiality the privacy of Sharlene is safeguarded[17] and, importantly, the privacy, both present and future, of her two siblings is protected from public intrusion, so that they may grow and become adults without unnecessary stigma associated with this case. As counsel for Sharlene's siblings notes, "After the media circus surrounding the plight of this child subsides . . . her siblings will be left to endure the pain of its aftermath. All three of these children are entitled to the protection [of confidentiality ordered by the] court," as required by statute and rule.

Because the law governing care and protection proceedings makes those proceedings closed to the public, the Uniform Rules on Impoundment Procedure have no general application to this case. See Rule 1 of the Uniform Rules on Impoundment Procedure (2005).[18] We do not depart from our cases that recognize a common-law right of access to the records of

---

[17]The petitioner asserts in his brief that "the child's grave condition, as a practical matter, leaves her unable to comprehend any invasion of privacy and obviates any need to protect her privacy." This statement is disturbing and has no merit. Our laws afford incompetent persons, including children such as Sharlene, equal respect for personal dignity and privacy as competent persons. See *Care & Protection of Beth, supra* at 196-197, and cases cited.

[18]In order to seek relief from Standing Order 1-84, the petitioner would have had to file a motion, supported by an affidavit, pursuant to Rule 11 of the Uniform Rules on Impoundment Procedure (2005), which applies to cases where material is required to be impounded by statute, court rule, or standing order. The judge's modification of the original impoundment order, ac-

judicial proceedings, see *Boston Herald, Inc.* v. *Sharpe,* 432 Mass. 593, 605 (2000); *Commonwealth* v. *Blondin,* 324 Mass. 564, 569 (1949), cert. denied, 339 U.S. 984 (1950); *Cowley* v. *Pulsifer,* 137 Mass. 392, 394 (1884), nor disagree with a decision of the United States Court of Appeals for the First Circuit, cited by the petitioner, holding that the First Amendment to the United States Constitution may encompass a public right of access to records submitted in connection with criminal cases. See *Globe Newspaper Co.* v. *Pokaski,* 868 F.2d 497 (1st Cir. 1989). These decisions, however, did not involve Juvenile Court records, which, by law, are confidential. We conclude that the judge properly ruled that the findings and order of the October 5 hearing should remain unavailable to the general public.

4. A few final observations are in order. Some describe this as a case about death. It should more correctly be described as a case about a young girl who has suffered tremendously from acts of violence and cruelty and who now will be permitted to pass away with dignity. Sharlene's memory will remind us, time and again, that we, as a society, need to do more to aid children who are neglected and abused, and thereby denied the care and nurturing they so desperately want and need. If Sharlene's case helps other children to escape their misery, her short life will not have been in vain.

5. The order denying the petitioner's motion to be declared Sharlene's de facto parent and to participate in the hearing on the joint emergency motion for an order to withdraw life support and not resuscitate is affirmed. The orders to withdraw life support currently in place for Sharlene and to refrain from resuscitation of Sharlene, and that the documents and records be released to no one, except by order of the court, are affirmed.

*So ordered.*

SPINA, J. (concurring, with whom Cowin, J., joins). I agree with the court's opinion. I write separately to call attention to

companied by written findings, which allowed the petitioner access to the judge's written decision on the joint emergency motion, effected the type of relief contemplated by rule 11.

an issue that was not raised by the parties but has a significant impact on the public interest. The issue is whether a judicial hearing on a petition to withdraw life support systems from a child should be closed to the public simply because it takes place in the context of a care and protection proceeding.

The Supreme Judicial Court Guidelines on the Public's Right of Access to Judicial Proceedings and Records (2000) begins with the following two sentences: "Judicial proceedings should not be shrouded in secrecy. Access fosters informed public discussion of governmental affairs." The guidelines then quote *Cowley* v. *Pulsifer*, 137 Mass. 392, 394 (1884) (Holmes, J.), where the court said, "It is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed." This principle is especially apt in cases that will result, irreversibly, in a loss of life.

Care and protection cases are closed to the public. G. L. c. 119, § 38. The State has a legitimate interest in protecting children from the stigma that may be associated with having parents who are accused of being unfit, or who have been found to be unfit. Orders in care and protection proceedings address these issues "to insure the rights of any child to sound health and normal physical, mental, spiritual and moral development." G. L. c. 119, § 1, first par. Closed proceedings thus are justified.

The decision to withdraw life support, however, is unlike any other that may be made in a care and protection case. It focuses not only on the child's health and the best interests of the child, but on whether under the substituted judgment standard the child would, if competent, choose to forgo the use of extraordinary means to sustain life. *Custody of a Minor (No. 1)*, 385 Mass. 697, 703 (1982). This standard is the same standard that is applied in every case involving the issue of withdrawal of life support, regardless of the court or the age of the person who is subject to the withdrawal order. *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728 (1977). The hearing

does not implicate the public policy concerns that provide the basis for closing care and protection cases to the public because it involves no accusation of parental unfitness, remediation of parental unfitness, or stigma associated with parental unfitness that the child will carry with her through life. If the order to withdraw life support is made, it is expected that the child will not live to suffer any stigma.

More important is the need for assurance that those seeking to terminate life in fact have the best interests of the child at heart and that the child's best interests are being served. The public is entitled to know that those seeking the orders are not trying to conceal foul play, or that the expense of maintaining life is not driving the request. Although there is not a hint of these concerns in this case, the best way to ensure that those involved in the petition are in fact working toward the best interests of the child is to open the hearing to public scrutiny.

The need for open proceedings is particularly compelling where an agency of the executive branch of government seeks to persuade the judicial branch of government to withdraw life support. Decisions of this gravity, made with this concentration of government involvement, should be made in public. Withdrawal of life support does not arise solely in the context of a care and protection proceeding. It may arise on a petition of a hospital in the Probate and Family Court or the Superior Court. See, e.g., *Matter of Rena*, 46 Mass. App. Ct. 335 (1999). Such a hearing would be open to the public unless closed after findings are made conformably with the Uniform Rules on Impoundment Procedure (2005). There is no reason to treat these hearings differently simply because the Department of Social Services is involved.

When care and protection proceedings were first closed to the public by St. 1954, c. 646, § 1, this issue probably had not been anticipated. The most extreme case to arise in the twenty-four years that followed involved an order to provide life-sustaining medical treatment contrary to the parents' wishes. See *Custody of a Minor*, 375 Mass. 733 (1978). Medical advances have changed the landscape but the statute remains unchanged. The issue warrants reexamination by the Legislature.